John Robertelli, Esq.
Gene Y. Kang, Esq.
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Christina Bezas, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
21 Main Street, Suite 158
Court Plaza South, West Wing
Hackensack, New Jersey 07601
(201) 287–2460
john.robertelli@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company and GEICO Casualty Co.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., | Case No.: |
| Plaintiffs, | |
| –against– | **COMPLAINT** |
| | Plaintiffs Demand a Trial by Jury |
| PAUL F. LYONS, D.C., P.A. d/b/a  ACCELERATED HEALING CENTER, PAUL F. LYONS, JR., D.C., and ROBERT W. DAVIS, P.T., | |
| Defendants. | |

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

### INTRODUCTION

1.      This action seeks to recover more than $900,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted thousands of fraudulent no-fault insurance charges through Paul F. Lyons, D.C., P.A. d/b/a Accelerated

Healing Center ("Accelerated Healing") for purported initial examinations, follow-up examinations, chiropractic services, and physical therapy services (the purported initial examinations, follow-up examinations, chiropractic services, and physical therapy services are referred to hereinafter as the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided, to the extent that they were provided at all, to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that Accelerated Healing was, at all relevant times, not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, because:

(i)     Accelerated Healing and its owner, Defendant Paul F. Lyons, Jr., D.C. ("Lyons"), billed for medically unnecessary and in some cases illusory Fraudulent Services that were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    Accelerated Healing and Lyons failed to create and maintain true accurate treatment records at Accelerated Healing, as required by law.

4.      The Defendants fall into the following categories:

(i)     Defendant Accelerated Healing is a New Jersey chiropractic professional corporation through which the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

(ii)    Defendant Lyons is a chiropractor licensed to practice chiropractic in New Jersey, who was the owner of Accelerated Healing, and purported to perform many of the Fraudulent Services.

(iii)   Defendant Robert W. Davis, P.T. ("Davis") is a physical therapist licensed to practice physical therapy in New Jersey, was associated with Lyons and Accelerated Healing, and purported to perform many of the Fraudulent Services on behalf of Accelerated Healing.

5.      As discussed below, the Defendants at all relevant times have known that:

(i)     the Defendants were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible to receive no-fault insurance reimbursement in the first instance;

(ii)    the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible for no-fault insurance reimbursement in the first instance;

(iii)   the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    in many cases, the Fraudulent Services were never provided in the first instance; and

(v)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Accelerated Healing.

7.      The charts annexed hereto as Exhibit "1" set forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted, or caused to be submitted, to GEICO.

8.      The Defendants' fraudulent scheme began as early as 2012 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $900,000.00.

## THE PARTIES

### I.      Plaintiffs

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. are Maryland corporations with their

principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

## II.   Defendants

10.     Defendant Accelerated Healing is a New Jersey chiropractic professional corporation with its principal place of business in New Jersey. Accelerated Healing was incorporated on or about February 25, 1988, was owned by Lyons, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO.

11.     Defendant Lyons resides in and is a citizen of New Jersey. Lyons was licensed to practice chiropractic in New Jersey in 1985, owned Accelerated Healing, and purported to perform many of the Fraudulent Services at Accelerated Healing.

12.     Defendant Davis resides in and is a citizen of New Jersey. Davis was licensed to practice physical therapy in New Jersey in 1984, and purported to perform many of the Fraudulent Services at Accelerated Healing.

### JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

14.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

15.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

16.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

### A.     The New Jersey No-Fault Laws

17.     New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B–1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A–1 et seq.)(collectively referred to as the "No Fault Laws"), which require automobile insurers to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

18.     Under the No Fault Laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA–1500 form").

### B.     No-Fault Reimbursement and Compliance With New Jersey Law Governing Healthcare Practice

19.     In order for a healthcare services provider to be eligible to receive PIP Benefits, it must comply with all relevant laws and regulations governing healthcare practice in New Jersey.

20.     Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all applicable statutory and regulatory requirements governing

healthcare practice in New Jersey, whether or not the underlying services were medically necessary. See, e.g., Liberty Mut. Ins. Co. v. Healthcare Integrated Servs., 2009 N.J. Super. Unpub. LEXIS 2416 at *4 – *5 (App. Div. 2009)("This court has held that a provider of such services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations."); Varano, Damian & Finkel, L.L.C. v. Allstate Ins. Co., 366 N.J. Super. 1, 6 (App. Div. 2004)(healthcare services provider operated in violation of pertinent regulatory standards "is not eligible to receive PIP benefits."); Allstate Ins. Co. v. Orthopedic Evaluations, Inc., 300 N.J. Super. 510, 515–519 (App. Div. 1997)(healthcare services provider's lack of compliance with pertinent regulatory standards rendered it ineligible to collect PIP Benefits, whether or not the underlying services were medically necessary); Allstate Ins. Co. v. Greenberg, 376 N.J. Super. 623, 632 (Law Div. 2004)("A medical services provider's failure to comply with the standards promulgated by the Board of Medical Examiners make it ineligible to receive PIP reimbursement."); Allstate Ins. Co. v. Schick, 328 N.J. Super. 611, 620 (1999)("[A]n insurer may properly deny PIP benefits under the No Fault Law based upon a healthcare provider's failure to comply with the administrative regulations governing the practice of healthcare in this State.")

21.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey. See, e.g., Healthcare Integrated Servs., supra; Orthopedic Evaluations, Inc., supra.

22.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

23. Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for healthcare services that are not rendered in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

**C.    No-Fault Reimbursement, Medical Necessity, and the New Jersey No-Fault Care Paths**

24. Pursuant to N.J.S.A. 39:6A–4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

25. Pursuant to N.J.S.A. 39:6A–2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury

(i)     is not primarily for the convenience of the injured person or provider;

(ii)    is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization; and

(iii)   does not involve unnecessary diagnostic testing.

26. Pursuant to the No-Fault Laws, the New Jersey Commissioner of Banking and Insurance (the "Commissioner") has designated specific care paths (the "Care Paths") as the standard course of medically necessary treatment for certain types of neck and back soft tissue injuries that commonly are sustained in automobile accidents. See N.J.A.C. 11:3–4.6.

27. Specifically, the Commissioner has promulgated Care Paths for the following types of injuries:

(i)     cervical spine strains, sprains, and contusions;

    (ii)      cervical herniated disks or radiculopathies;

    (iii)     thoracic spine strains, sprains, and contusions;

    (iv)     thoracic herniated disks or radiculopathies;

    (v)      lumbar–sacral spine strains, sprains, and contusions; and

    (vi)     lumbar–sacral herniated disks or radiculopathies.

28.     The Care Paths generally provide for an initial, four–week course of conservative treatment including chiropractic services, physical therapy, medication, and exercise.

29.     Should a healthcare services provider wish to provide additional treatment to an Insured beyond the initial four weeks of conservative treatment, the Care Paths require the provider to demonstrate at the four–week mark, the eight–week mark, and the 13–week mark that continued treatment is warranted based on the Insured's individual circumstances. See New Jersey Department of Banking and Insurance Comments, 30 N.J.R. 4401(a).

30.     The guidelines established by the Commissioner in the Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

**D.    Accurate Patient Record-Keeping**

31.     New Jersey requires chiropractors to maintain – for at least seven years – patient records that accurately reflect the care or services rendered, including but not limited to accurate reports of examination results and diagnoses. See N.J.A.C. § 13:44E-2.2.

32.     Accuracy and completeness in chiropractic recordkeeping is a vital element of the standard of care, whether for soft tissue injury patients or any other type of patient.

33.     Precise, thorough examination, diagnostic testing, and treatment reports are critically important because important clinical decisions depend on their integrity and quality.

Other chiropractors, medical doctors, and healthcare providers commonly rely on medical records maintained by a chiropractor because they reasonably presume that:

(i)     the chiropractor who generated the records performed the services reflected in the records in a manner consistent with the standard of care;

(ii)    the information and data contained within the records were legitimately obtained by the chiropractor and were not altered or contrived; and

(iii)   the chiropractor analyzed and interpreted the data in a manner consistent with the standard of care.

34.     Chiropractors and chiropractic practices that fail to maintain accurate patient records, or that falsify patient records, are not entitled to receive PIP Benefits.

**E.      The Fee Schedule and Current Procedural Terminology Codes**

35.     New Jersey has established a medical fee schedule (the "Fee Schedule") that is applicable to claims for PIP Benefits.

36.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

37.     The No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A–4.6; N.J.A.C. 11:3–29.6.

38.     The New Jersey Administrative Code provides that the Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's

CPT Assistant (the "CPT Assistant").

39.     Additionally, No-Fault providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, i.e., unbundled. The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

40.     The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey No-Fault insurance regulations. See N.J.A.C. 11:3–29.4.

41.     With respect to unbundling, N.J.A.C. 11:3-29.4 provides that:

Artificially separating or partitioning what is inherently one total Procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

42.     Chapter 1 of the NCCI Policy manual provides that:

Procedures should be reported with the most comprehensive CPT code that describes the services performed. Physicians must not unbundle the services described by a HCPCS/CPT code.

43.     Chapter 12 of the MCPM provides that:

The narrative for many CPT codes includes a parenthetical statement that the Procedure represents a 'separate Procedure.' The inclusion of this statement indicates that the Procedure, while possible to perform separately, is generally included in a more comprehensive Procedure, and the service is not to be billed when a related, more comprehensive, service is performed.

**F.     The New Jersey Insurance Fraud Prevention Act**

44.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A–1 et seq. A healthcare services provider violates the Insurance Fraud Prevention Act if, among other things, it:

Presents or causes to be presented any written or oral statement as part of, or in support of

or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A–4.

45.     A healthcare services provider also violates the Insurance Fraud Prevention Act if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

46.     Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A–7(a).

47.     A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A–7(b).

48.     The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A–3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A–3.

II.     **The Defendants' Fraudulent Scheme**

49.     Beginning no later than 2012, and continuing through the present date, the Defendants masterminded and implemented a massive fraudulent scheme in which they billed

11

GEICO hundreds of thousands of dollars, or caused GEICO to be billed hundreds of thousands of dollars, for unlawful, medically unnecessary, and otherwise unreimbursable services.

**A.      The Defendants' Fraudulent Treatment and Billing Protocol**

50.      The vast majority of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant, continuing injuries or health problems as a result of the minor accidents they experienced or purported to experience.

51.      Even so, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol.

52.      This pre-determined, fraudulent protocol was designed to maximize the billing that the Defendants could submit to insurers, including GEICO, not to benefit the Insureds who purportedly were subjected to it.

53.      The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentation, or – in many cases – the total absence of any actual medical problems arising from any automobile accidents.

54.      Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

55.     No legitimate chiropractor, physical therapist, chiropractic practice, or other healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

56.     The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to continue profiting from their fraudulent scheme.

**1.      The Fraudulent Charges for Initial Examinations**

57.     As an initial step in the Defendants' fraudulent scheme, Accelerated Healing and Lyons purported to provide virtually every Insured in the claims identified in Exhibit "1" with an initial examination. Lyons personally purported to perform virtually all of the initial examinations identified in Exhibit "1".

58.     As set forth in Exhibit "1", Accelerated Healing and Lyons billed the initial examinations through Accelerated Healing to GEICO under CPT code 99203, typically resulting in charges of either $125.00 or $130.00 for each initial examination they purported to provide.

59.     In the claims for initial examinations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Accelerated Healing's eligibility to collect PIP Benefits in the first instance.

60.     In fact, Accelerated Healing never was eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither Accelerated Healing nor the examinations was in compliance with the relevant laws and regulations governing healthcare practice in New Jersey.

61. The charges for the initial examinations also were fraudulent in that they misrepresented the nature and extent of the putative examinations, and whether they actually were performed in the first instance.

**a.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

62. In the claims for initial examinations under CPT code 99203 identified in Exhibit "1", Accelerated Healing and Lyons routinely misrepresented the severity of the Insureds' presenting problems.

63. Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99203 to bill for an initial patient examination typically requires that the Insured present with problems of moderate severity.

64. The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

65. For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 48–year–old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)      Initial office evaluation of 49–year–old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)      Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)      Initial office visit for evaluation of 13–year–old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

14

(v)    Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

66.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

67.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as acute sprains and strains.

68.    For instance, and in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in most of the claims identified in Exhibit "1" the contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

69.    What is more, and again in keeping with the fact that the Insureds in the claims identified in Exhibit "1" either had no presenting problems at all as the result of their relatively minor automobile accidents, or else problems of low severity, in many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

70.    To the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

71.     Even so, in the claims for initial examinations identified in Exhibit "1", Accelerated Healing and Lyons billed for their putative initial examinations using CPT code 99203, and thereby falsely represented that the Insureds presented with problems of moderate severity.

72.     For example:

(i)     On June 2, 2013, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of JG by Lyons on June 10, 2013, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ii)    On November 27, 2013, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JD's vehicle was drivable following the accident. The police report further indicated that, although JD complained of pain to her head, JD refused medical attention at the scene. Nonetheless, later that day, JD traveled on her own to Overlook Medical Center Emergency Department. The contemporaneous hospital records indicated that JD complained of dull, achy neck pain and a headache. The hospital records further indicated that JD was briefly observed on an outpatient basis and discharged that same day with an acute cervical strain diagnosis. To the extent that JD experienced any health issues at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of JD by Lyons on December 16, 2013, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iii)   On February 28, 2015, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JC's vehicle was drivable following the accident. The police report further indicated that JC complained of pain to his back and was transported to Somerset Medical Center Emergency Department following the accident. The contemporaneous hospital records indicated that JC complained of knee, wrist, and back pain. The hospital records further indicated that JC was briefly observed on an outpatient basis and discharged that same day with wrist

and knee sprain, and lumbar strain diagnoses. To the extent that JC experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within 10 months of the accident. Even so, following a purported initial examination of JC by Lyons on January 19, 2016, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(iv)    On July 14, 2015, an Insured named FE was involved in an automobile accident. The contemporaneous police report indicated that FE's vehicle was drivable following the accident. The police report further indicated that FE was not injured and did not complain of any pain at the scene. In keeping with the fact that FE was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that FE experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of FE by Lyons on October 5, 2015, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(v)    On May 16, 2016, an Insured named MN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MN's vehicle was drivable following the accident. The police report further indicated that MN was not injured and did not complain of any pain at the scene. In keeping with the fact that MN was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that MN experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MN by Lyons on May 23, 2016, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vi)    On May 16, 2016, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that SA's vehicle was drivable following the accident. The police report further indicated that SA was not injured and did not complain of any pain at the scene. To the extent that SA experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of SA by Lyons on May 23, 2016, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(vii)    On August 8, 2016, an Insured named KH was involved in an automobile accident. The contemporaneous police report indicated that KH's vehicle was drivable following the accident. The police report further indicated that KH was

not injured and did not complain of any pain at the scene. In keeping with the fact that KH was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that KH experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of KH by Lyons on October 17, 2016, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(viii)   On December 20, 2016, an Insured named MV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MV's vehicle was drivable following the accident. The police report further indicated that, although MV complained of pain to her back, she refused medical attention at the scene. Following the accident emergency medical services responded to the scene. The contemporaneous emergency medical services records indicated that, although MV complained of back pain, she refused medical attention at the scene. Nonetheless, the following day, on December 21, 2016, MV traveled on her own to Saint Peter's University Hospital Emergency Department. The contemporaneous hospital records indicated that, although MV complained of intermittent pain to her leg, MV denied any pain to her back. The hospital records further indicated that MV was briefly observed on an outpatient basis and discharged that same day without a formal diagnosis, only the notation that she had been involved in a motor vehicle accident. To the extent that MV experienced any health issues at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of MV by Lyons on January 17, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(ix)   On December 20, 2016, an Insured named GV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that GV's vehicle was drivable following the accident. The police report further indicated that GV was not injured and did not complain of any pain at the scene. Nonetheless, the following day, on December 21, 2016, GV traveled on her own to Saint Peter's University Hospital Emergency Department. The contemporaneous hospital records indicated that GV complained of intermittent pain to her ankle and denied any pain to her back. The hospital records further indicated that GV was briefly observed on an outpatient basis and discharged that same day without a formal diagnosis, only with the notation that she had been involved in a motor vehicle accident. To the extent that GV experienced any health issues at all as the result of the accident, they were of low severity. Even so, following a purported initial examination of GV by Lyons on January 17, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

18

(x)     On January 9, 2017, an Insured named HS was involved in an automobile accident. The contemporaneous police report indicated that HS's vehicle was struck by a vehicle backing out of a driveway into the street. The police report further indicated that HS was not injured and did not complain of any pain at the scene. In keeping with the fact that HS was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that HS experienced any health issues at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of HS by Lyons on January 19, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xi)    On January 12, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MR experienced any health issues at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MR by Lyons on January 18, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xii)   On March 13, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of AS by Lyons on April 4, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiii)  On March 13, 2017, an Insured named AO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that AO's vehicle was drivable following the accident. The police report further indicated that AO was not injured and did not complain of any pain at the scene. In keeping with the fact that AO was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that AO experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of AO by Lyons on March 30, 2017, Lyons and Accelerated Healing billed GEICO

for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xiv)   On May 19, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that JR experienced any health issues at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of JR by Lyons on June 7, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xv)   On July 14, 2017, an Insured named BJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that BJ's vehicle was drivable following the accident. The police report further indicated that BJ was not injured and did not complain of any pain at the scene. Nonetheless, later that day BJ traveled on her own to Family Care, and Family Care conducted an independent physical examination of BJ. The contemporaneous Family Care records indicated that BJ complained of back, neck, and knee pain. The Family Care records further indicated that BJ was diagnosed with cervical and lumbar strain, and a mild knee contusion. To the extent that BJ experienced any health issues at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of BJ by Lyons on August 7, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xvi)   On August 1, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that RM's vehicle was drivable following the accident. The police report further indicated that RM complained of pain to his neck and was transported to Saint Peters University Hospital Emergency Department following the accident. The contemporaneous hospital records indicated that RM was briefly observed on an outpatient basis and discharged that same day with a muscle strain diagnosis. To the extent that RM experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of RM on August 7, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xvii)   On September 1, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that MB's vehicle was drivable following the accident. The police report further indicated that MB was

not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MB by Lyons on September 27, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xviii)   On September 26, 2017, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that ER's vehicle was drivable following the accident. The police report further indicated that ER complained of pain to her back and was transported to New York Presbyterian Hospital Emergency Department following the accident. The contemporaneous hospital records indicated that ER complained of pain to her lower back. The hospital records further indicated that ER was briefly observed on an outpatient basis and discharged that same day with a lower back pain diagnosis. To the extent that ER experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of ER by Lyons on October 2, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xix)   On October 26, 2017, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of AR by Lyons on November 8, 2017, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

(xx)   On February 23, 2018, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MG's vehicle was drivable following the accident. The police report further indicated that MG was not injured and did not complain of any pain at the scene. In keeping with the fact that MG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of low severity. Even so, following a purported initial examination of MG by Lyons on April 11, 2018, Lyons and Accelerated Healing billed GEICO

21

for the initial examination using CPT code 99203, and thereby falsely represented that the examination involved moderately severe presenting problems.

73.     These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Accelerated Healing and Lyons routinely falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all.

74.     In the claims for initial examinations identified in Exhibit "1", Accelerated Healing and Lyons routinely falsely represented that the Insured presented with problems of moderate severity in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

75.     In the claims for initial examinations identified in Exhibit "1", Accelerated and Lyons also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including purported follow-up examinations, chiropractic services, and physical therapy services.

**b.     Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

76.     The Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for an initial examination represents that the chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

77.     As set forth in Exhibit "1", Accelerated Healing and Lyons submitted all of their billing for initial examinations under CPT code 99203, and thereby represented that the

22

chiropractor who purported to perform the initial examinations spent either at least 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

78.     In fact, in the claims for the initial examinations identified in Exhibit "1", neither Lyons nor any other chiropractor associated with Accelerated Healing ever spent 30 minutes of face-to-face time with the Insureds or their families when conducting the examinations.

79.     Rather, in the claims for the initial examinations identified in Exhibit "1", the initial examinations did not entail more than 15 minutes of face-to-face time between Lyons and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

80.     For instance, and in keeping with the fact that the initial examinations allegedly provided by Lyons through Accelerated Healing did not entail more than 15 minutes of face-to-face time with the Insureds or their families, Lyons used a template in purporting to conduct the initial examinations.

81.     The template that Lyons used in purporting to conduct the initial examinations set forth a limited range of examination parameters.

82.     The only face-to-face time between Lyons and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews, limited examinations of the Insureds' musculoskeletal systems, and a perfunctory check of a few of the Insureds' other systems.

83.     These brief interviews and limited examinations did not require Lyons, or any other chiropractor associated with Accelerated Healing, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

84.     In the claims for initial examinations identified in Exhibit "1", Accelerated

Healing and Lyons falsely represented that the examinations involved at least 30 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that require less time to perform.

### c.     Misrepresentations Regarding "Detailed" Physical Examinations

85.     Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the chiropractor who performed the examination conducted a "detailed" physical examination.

86.     Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the chiropractor conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

87.     To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their relatively minor automobile accidents, the complaints were limited to musculoskeletal complaints.

88.     Pursuant to the CPT Assistant, in the context of patient examinations, a chiropractor has not conducted an extended examination of a patient's musculoskeletal organ system unless the chiropractor has documented findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)      examination of sensation.

89.     In the claims identified in Exhibit "1", when Accelerated Healing and Lyons billed for the initial examinations under CPT code 99203, they falsely represented that the chiropractor who purported to perform the examinations – namely Lyons – performed "detailed" patient examinations on the Insureds he purported to treat during the initial examinations.

90.     In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Accelerated Healing and Lyons routinely failed to provide an extended examination of the Insureds' musculoskeletal systems.

91.     For instance, in each of the claims under CPT code 99203 identified in Exhibit "1", Accelerated Healing and Lyons routinely failed to provide an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling,

25

varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)     examination of sensation.

92.     For example:

(i)     On June 10, 2013, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named JG, and thereby represented that they had provided a "detailed" physical examination to JG. However, Lyons did not document an extended examination of JG's musculoskeletal system, despite the fact that – to the extent JG had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)    On December 16, 2013, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named JD, and thereby represented that they had provided a "detailed" physical examination to JD. However, Lyons did not document an extended examination of JD's musculoskeletal system, despite the fact that – to the extent JD had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)   On July 10, 2014, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named LH, and thereby represented that they had provided a "detailed" physical examination to LH. However, Lyons did not document an extended examination of LH's musculoskeletal system, despite the fact that – to the extent LH had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)     On October 3, 2014, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named JM, and thereby represented that they had provided a "detailed" physical examination to JM. However, Lyons did not document an extended examination of JM's musculoskeletal system, despite the fact that – to the extent JM had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(v)      On October 5, 2015, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named FE, and thereby represented that they had provided a "detailed" physical examination to FE. However, Lyons did not document an extended examination of FE's musculoskeletal system, despite the fact that – to the extent FE had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)     On January 19, 2016, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named JC, and thereby represented that they had provided a "detailed" physical examination to JC. However, Lyons did not document an extended examination of JC's musculoskeletal system, despite the fact that – to the extent JC had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)    On May 5, 2016, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named VN, and thereby represented that they had provided a "detailed" physical examination to VN. However, Lyons did not document an extended examination of VN's musculoskeletal system, despite the fact that – to the extent VN had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)   On May 23, 2016, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named MN, and thereby represented that they had provided a "detailed" physical examination to MN. However, Lyons did not document an extended examination of MN's musculoskeletal system, despite the fact that – to the extent MN had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)     On May 23, 2016, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named SA, and thereby represented that they had provided a "detailed" physical examination to SA. However, Lyons did not document an extended examination of SA's musculoskeletal system, despite the fact that – to the extent SA had any complaints at all as a result of the automobile accident – they were limited to

27

musculoskeletal complaints.

(x)     On May 24, 2016, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named ED, and thereby represented that they had provided a "detailed" physical examination to ED. However, Lyons did not document an extended examination of ED's musculoskeletal system, despite the fact that – to the extent ED had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(xi)    On May 26, 2016, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named KD, and thereby represented that they had provided a "detailed" physical examination to KD. However, Lyons did not document an extended examination of KD's musculoskeletal system, despite the fact that – to the extent KD had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(xii)   On July 8, 2016, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named RP, and thereby represented that they had provided a "detailed" physical examination to RP. However, Lyons did not document an extended examination of RP's musculoskeletal system, despite the fact that – to the extent RP had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(xiii)  On July 8, 2016, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named CV, and thereby represented that they had provided a "detailed" physical examination to CV. However, Lyons did not document an extended examination of CV's musculoskeletal system, despite the fact that – to the extent CV had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(xiv)   On October 12, 2016, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named BA, and thereby represented that they had provided a "detailed" physical examination to BA. However, Lyons did not document an extended examination of BA's musculoskeletal system, despite the fact that – to the extent BA had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(xv)    On December 21, 2016, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named MD, and thereby represented that they had provided a "detailed" physical examination to MD. However, Lyons did not document an extended

examination of MD's musculoskeletal system, despite the fact that – to the extent MD had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(xvi)    On January 17, 2017, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named KR, and thereby represented that they had provided a "detailed" physical examination to KR. However, Lyons did not document an extended examination of KR's musculoskeletal system, despite the fact that – to the extent KR had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(xvii)   On January 24, 2017, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named KH, and thereby represented that they had provided a "detailed" physical examination to KH. However, Lyons did not document an extended examination of KH's musculoskeletal system, despite the fact that – to the extent KH had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(xviii)  On June 19, 2017, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named EF, and thereby represented that they had provided a "detailed" physical examination to EF. However, Lyons did not document an extended examination of EF's musculoskeletal system, despite the fact that – to the extent EF had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(xix)    On September 27, 2017, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named MB, and thereby represented that they had provided a "detailed" physical examination to MB. However, Lyons did not document an extended examination of MB's musculoskeletal system, despite the fact that – to the extent MB had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(xx)     On October 2, 2017, Lyons and Accelerated Healing billed GEICO under CPT code 99203 for an initial examination that Lyons purported to perform on an Insured named ER, and thereby represented that they had provided a "detailed" physical examination to ER. However, Lyons did not document an extended examination of ER's musculoskeletal system, despite the fact that – to the extent ER had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

93.     These are only representative examples. In virtually all of the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Accelerated Healing and Lyons falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because Lyons had not documented an extended examination of the affected body areas and other symptomatic or related organ systems.

94.     In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Accelerated Healing and Lyons falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT 99203 are reimbursable at higher rates than examinations that do not require the examining physician or chiropractor to provide "detailed" physical examinations.

**d.      Misrepresentations Regarding the Extent of Medical Decision-making**

95.     Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the chiropractor who performed the examination engaged in medical decision-making of "low complexity".

96.     Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

97.     As set forth above, the CPT Assistant provides various clinical examples of the

kinds of presenting problems that might support the use of CPT code 99203 to bill for a patient examination, and therefore entail legitimate, low complexity medical decision-making, including:

(i)     Office visit for initial evaluation of a 48–year–old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49–year–old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13–year–old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

98.     Thus, pursuant to the CPT Assistant, the kinds of presenting problems that entail legitimate, low-complexity medical decision-making typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

99.     By contrast, when the Insureds in the claims identified in Exhibit "1" presented at Accelerated Healing for initial examinations, their presenting problems virtually always were limited to low severity soft tissue injuries such as acute sprains and strains, to the extent that they had any legitimate presenting problems at all.

100.    The diagnosis and treatment of these low severity sprains and strains did not require any legitimate, low-complexity medical decision-making.

101.    First, in Accelerated Healing and Lyons' claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any

significant amount of medical records, diagnostic tests, or other information.

102.    When the Insureds in the claims identified in Exhibit "1" presented to Accelerated Healing for "treatment", they did not arrive with any medical records except, at times, basic radiology reports.

103.    Furthermore, prior to the initial examinations, Accelerated Healing and Lyons neither requested any medical records from any other providers, nor conducted any diagnostic tests.

104.    Second, in Accelerated Healing and Lyons' claims for initial examinations identified in Exhibit "1", there was no risk of significant complications or morbidity – much less mortality – from the Insureds' relatively minor soft tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

105.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Accelerated Healing and Lyons, to the extent that Accelerated Healing and Lyons provided any such diagnostic procedures or treatment options in the first instance.

106.    In almost every instance, any "treatments" that Accelerated Healing and Lyons actually provided were limited to chiropractic treatment and/or physical therapy treatment, none of which was health– or life–threatening if properly administered.

107.    Third, in Accelerated Healing and Lyons' claims for initial examinations identified in Exhibit "1", Accelerated Healing and Lyons did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

108.    Rather, to the extent that the initial examinations were conducted in the first instance, Accelerated Healing and Lyons provided a phony series of objectively unverifiable soft

tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

109.   Specifically, in the vast majority of claims identified in Exhibit "1", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

110.   Even so, Accelerated Healing and Lyons prepared initial examination reports in which they provided a phony series of objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

111.   Then, based upon these phony "diagnoses", Accelerated Healing and Lyons directed virtually every Insured: (i) to receive extensive and medically unnecessary chiropractic treatment; and (ii) to return to Accelerated Healing for a follow-up examination, regardless of the Insureds' true circumstances or presentation.

112.   For example:

(i)     On June 2, 2013, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of low severity. On June 10, 2013, Lyons purported to conduct an initial examination of JG at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided JG with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JG's presenting problems, nor the treatment plan provided to JG by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, JG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services,

which did not pose the least bit of risk to JG. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)     On November 27, 2013, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JD's vehicle was drivable following the accident. The police report further indicated that, although JD complained of pain to her head, JD refused medical attention at the scene. Later that day, JD traveled on her own to Overlook Medical Center Emergency Department. The contemporaneous hospital records indicated that JD complained of dull, achy neck pain and a headache. The hospital records further indicated that JD was briefly observed on an outpatient basis and discharged that same day with an acute cervical strain diagnosis. To the extent that JD experienced any health issues at all as the result of the accident, they were of low severity. On December 16, 2013, Lyons purported to conduct an initial examination of JD at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided JD with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JD's presenting problems, nor the treatment plan provided to JD by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, JD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to JD. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On February 28, 2015, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JC's vehicle was drivable following the accident. The police report further indicated that JC complained of pain to his back and was transported to Somerset Medical Center Emergency Department following the accident. The contemporaneous hospital records indicated that JC complained of knee, wrist, and back pain. The hospital records further indicated that JC was briefly observed on an outpatient basis and discharged that same day with wrist and knee sprain, and lumbar strain diagnoses. To the extent that JC experienced any health problems at all as a result of the accident, they were of low severity. On January 19, 2016 – almost 11 months after JC's minor accident – Lyons purported to conduct an initial examination of JC at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records,

34

diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided JC with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JC's presenting problems, nor the treatment plan provided to JC by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, JC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to JC. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)     On July 14, 2015, an Insured named FE was involved in an automobile accident. The contemporaneous police report indicated that FE's vehicle was drivable following the accident. The police report further indicated that FE was not injured and did not complain of any pain at the scene. In keeping with the fact that FE was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that FE experienced any health problems at all as a result of the accident, they were of low severity. On October 5, 2015, Lyons purported to conduct an initial examination of FE at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided FE with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither FE's presenting problems, nor the treatment plan provided to FE by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, FE did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to FE. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On May 16, 2016, an Insured named MN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MN's vehicle was drivable following the accident. The police report further indicated that MN was not injured and did not complain of any pain at the scene. In keeping with the fact that MN was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that MN experienced any health problems at all as a result of the accident, they were

of low severity. On May 23, 2016, Lyons purported to conduct an initial examination of MN at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided MN with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MN's presenting problems, nor the treatment plan provided to MN by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, MN did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, none of which posed the least bit of risk to MN. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On May 16, 2016, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that SA's vehicle was drivable following the accident. The police report further indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that SA experienced any health problems at all as a result of the accident, they were of low severity. On May 23, 2016, Lyons purported to conduct an initial examination of SA at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided SA with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SA's presenting problems, nor the treatment plan provided to SA by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, SA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to SA. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)   On August 8, 2016, an Insured named KH was involved in an automobile accident. The contemporaneous police report indicated that KH's vehicle was drivable following the accident. The police report further indicated that KH was

not injured and did not complain of any pain at the scene. In keeping with the fact that KH was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that KH experienced any health problems at all as a result of the accident, they were of low severity. On October 17, 2016, Lyons purported to conduct an initial examination of KH at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided KH with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither KH's presenting problems, nor the treatment plan provided to KH by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, KH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to KH. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)    On December 20, 2016, an Insured named MV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MV's vehicle was drivable following the accident. The police report further indicated that, although MV complained of pain to her back, she refused medical attention at the scene. Following the accident Emergency Medical Services responded to the scene. The contemporaneous emergency medical services records indicated that, although MV complained of back pain, she refused medical attention at the scene. The following day, on December 21, 2016, MV traveled on her own to Saint Peter's University Hospital Emergency Department. The contemporaneous hospital records indicated that, although MV complained of intermittent pain to her leg, MV denied any pain to her back. The hospital records further indicated that MV was briefly observed on an outpatient basis and discharged that same day without a formal diagnosis, only the notation that she had been involved in a motor vehicle accident. To the extent that MV experienced any health issues at all as the result of the accident, they were of low severity. On January 17, 2017, Lyons purported to conduct an initial examination of MV at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided MV with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MV's presenting problems, nor the treatment plan provided to MV by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary,

MV did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to MV. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)     On December 20, 2016, an Insured named GV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that GV's vehicle was drivable following the accident. The police report further indicated that GV was not injured and did not complain of any pain at the scene. The following day, on December 21, 2016, GV traveled on her own to Saint Peter's University Hospital Emergency Department. The contemporaneous hospital records indicated that GV complained of intermittent pain to her ankle and denied any pain to her back. The hospital records further indicated that GV was briefly observed on an outpatient basis and discharged that same day without a formal diagnosis, only with the notation that she had been involved in a motor vehicle accident. To the extent that GV experienced any health issues at all as the result of the accident, they were of low severity. On January 17, 2017, Lyons purported to conduct an initial examination of GV at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided GV with the substantially similar, phony objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GV's presenting problems, nor the treatment plan provided to GV by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, GV did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to GV. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)      On January 9, 2017, an Insured named HS was involved in an automobile accident. The contemporaneous police report indicated that HS's vehicle was struck by a vehicle backing out of a driveway into the street. The police report further indicated that HS was not injured and did not complain of any pain at the scene. In keeping with the fact that HS was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that HS experienced any health issues at all as a result of the accident, they were of low severity. On January 19, 2017, Lyons purported to conduct an initial examination

of HS at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided HS with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HS's presenting problems, nor the treatment plan provided to HS by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, HS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to HS. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)     On January 12, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MR experienced any health issues at all as a result of the accident, they were of low severity. On January 18, 2017, Lyons purported to conduct an initial examination of MR at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided MR with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MR's presenting problems, nor the treatment plan provided to MR by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, MR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to MR. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)    On March 13, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of

any pain at the scene. In keeping with the fact that AS was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low severity. On April 4, 2017, Lyons purported to conduct an initial examination of AS at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided AS with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AS's presenting problems, nor the treatment plan provided to AS by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, AS did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to AS. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)   On March 13, 2017, an Insured named AO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that AO's vehicle was drivable following the accident. The police report further indicated that AO was not injured and did not complain of any pain at the scene. In keeping with the fact that AO was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that AO experienced any health problems at all as a result of the accident, they were of low severity. On March 30, 2017, Lyons purported to conduct an initial examination of AO at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided AO with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AO's presenting problems, nor the treatment plan provided to AO by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, AO did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to AO. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiv)    On May 19, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that JR experienced any health issues at all as a result of the accident, they were of low severity. On June 7, 2017, Lyons purported to conduct an initial examination of JR at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided JR with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JR's presenting problems, nor the treatment plan provided to JR by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, JR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to JR. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)    On July 14, 2017, an Insured named BJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that BJ's vehicle was drivable following the accident. The police report further indicated that BJ was not injured and did not complain of any pain at the scene. Later that day BJ traveled on her own to Family Care, and Family Care conducted an independent physical examination of BJ. The contemporaneous Family Care records indicated that BJ complained of back, neck, and knee pain. The Family Care records further indicated that BJ was diagnosed with cervical and lumbar strain, and a mild knee contusion. To the extent that BJ experienced any health issues at all as a result of the accident, they were of low severity. On August 7, 2017, Lyons purported to conduct an initial examination of BJ at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided BJ with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BJ's presenting problems, nor the treatment plan provided to BJ by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, BJ did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and

41

Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to BJ. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvi)   On August 1, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that RM's vehicle was drivable following the accident. The police report further indicated that RM complained of pain to his neck and was transported to Saint Peters University Hospital Emergency Department following the accident. The contemporaneous hospital records indicated that RM was briefly observed on an outpatient basis and discharged that same day with a muscle strain diagnosis. To the extent that RM experienced any health problems at all as a result of the accident, they were of low severity. On August 7, 2017, Lyons purported to conduct an initial examination of RM at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided RM with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RM's presenting problems, nor the treatment plan provided to RM by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, RM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to RM. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xvii)   On September 1, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of low severity. On September 27, 2017, Lyons purported to conduct an initial examination of MB at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided MB with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore,

42

neither MB's presenting problems, nor the treatment plan provided to MB by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, MB did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to MB. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xviii)   On September 26, 2017, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that ER's vehicle was drivable following the accident. The police report further indicated that ER complained of pain to her back and was transported to New York Presbyterian Hospital Emergency Department following the accident. The contemporaneous hospital records indicated that ER complained of achy pain to her lower back. The hospital records further indicated that ER was briefly observed on an outpatient basis and discharged that same day with a lower back pain diagnosis. To the extent that ER experienced any health problems at all as a result of the accident, they were of low severity. On October 2, 2017, Lyons purported to conduct an initial examination of ER at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided ER with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither ER's presenting problems, nor the treatment plan provided to ER by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, ER did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to ER. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xix)   On October 26, 2017, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of low severity. On November 8, 2017, Lyons purported to conduct an initial examination of AR at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical

records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided AR with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AR's presenting problems, nor the treatment plan provided to AR by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, AR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to AR. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xx)   On February 23, 2018, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MG's vehicle was drivable following the accident. The police report further indicated that MG was not injured and did not complain of any pain at the scene. In keeping with the fact that MG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of low severity. On April 11, 2018, Lyons purported to conduct an initial examination of MG at Accelerated Healing. Lyons did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Lyons did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Lyons provided MG with the substantially similar, phony list of objectively unverifiable soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MG's presenting problems, nor the treatment plan provided to MG by Lyons and Accelerated Healing, presented any risk of significant complications, morbidity, or mortality. To the contrary, MG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Lyons and Accelerated Healing consisted of medically unnecessary chiropractic services, which did not pose the least bit of risk to MG. Even so, Lyons and Accelerated Healing billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Lyons engaged in some legitimate, low complexity medical decision-making during the purported examination.

113.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

114.   An individual's age, height, weight, general physical condition, location within

44

the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

115.    As set forth above, in the claims identified in Exhibit "1", virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accident at all.

116.    It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

117.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations by Accelerated Healing and Lyons with substantially identical injuries on or about the exact same dates after their accidents.

118.    Even so, in keeping with the fact that Accelerated Healing and Lyons' putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Accelerated and Lyons frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

119.    For example:

(i)      On November 27, 2013, two insureds – GD and JD – were involved in the same automobile accident. Thereafter, GD and JD presented – incredibly – on the exact same date, December 16, 2013, at Accelerated Healing for initial examinations by Lyons. GD and JD were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that GD and JD suffered any injuries at all in their accident, the injuries were different.

Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided GD and JD with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ii)     On January 16, 2014, two insureds – DD and CH – were involved in the same automobile accident. Thereafter, DD and CH presented – incredibly – on the exact same date, January 20, 2014, at Accelerated Healing for initial examinations by Lyons. DD and CH were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DD and CH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided DD and CH with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iii)    On April 6, 2014, two insureds – ML and OL – were involved in the same automobile accident. Thereafter, ML and OL presented – incredibly – on the exact same date, April 7, 2014, at Accelerated Healing for initial examinations by Lyons. ML and OL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ML and OL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided ML and OL with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)    On June 5, 2014, two insureds – AC and VE – were involved in the same automobile accident. Thereafter, AC and VE presented – incredibly – on the exact same date, June 10, 2014, at Accelerated Healing for initial examinations by Lyons. AC and VE were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AC and VE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided AC and VE with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(v)     On July 11, 2014, two insureds – CT and DA – were involved in the same automobile accident. Thereafter, CT and DA presented – incredibly – on the exact same date, July 17, 2014, at Accelerated Healing for initial examinations by Lyons. CT and DA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CT and DA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided CT and DA with substantially identical,

phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vi)     On October 8, 2014, two insureds – KM and YC – were involved in the same automobile accident. Thereafter, KM and YC presented – incredibly – on the exact same date, October 29, 2014, at Accelerated Healing for initial examinations by Lyons. KM and YC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that KM and YC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided KM and YC with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vii)    On July 20, 2015, two insureds – SA and MN – were involved in the same automobile accident. Thereafter, SA and MN presented – incredibly – on the exact same date, July 23, 2015, at Accelerated Healing for initial examinations by Lyons. SA and MN were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SA and MN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided SA and MN with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(viii)   On May 16, 2016, two insureds – SA and MN – were involved in the same automobile accident. Thereafter, SA and MN presented – incredibly – on the exact same date, May 23, 2016, at Accelerated Healing for initial examinations by Lyons. SA and MN were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that SA and MN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided SA and MN with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)     On July 1, 2016, two insureds – CV and RP – were involved in the same automobile accident. Thereafter, CV and RP presented – incredibly – on the exact same date, July 8, 2016, at Accelerated Healing for initial examinations by Lyons. CV and RP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CV and RP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided CV and RP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(x)     On October 22, 2016, three insureds – DM, IR, and NL – were involved in the same automobile accident. Thereafter, DM, IR, and NL presented – incredibly – on the exact same date, November 3, 2016, at Accelerated Healing for initial examinations by Lyons. DM, IR, and NL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DM, IR, and NL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided DM, IR, and NL with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for the three of them.

(xi)    On December 20, 2016, two insureds – RV and MV – were involved in the same automobile accident. Thereafter, RV and MV presented – incredibly – on the exact same date, January 17, 2017, at Accelerated Healing for initial examinations by Lyons. RV and MV were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RV and MV suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided RV and MV with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xii)   On December 24, 2016, three insureds – GG, ND, and OG – were involved in the same automobile accident. Thereafter, GG, ND, and OG presented – incredibly – on the exact same date, January 27, 2017, at Accelerated Healing for initial examinations by Lyons. GG, ND, and OG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that GG, ND, and OG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided GG, ND, and OG with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for the three of them.

(xiii)  On May 12, 2017, two insureds – JG and CR – were involved in the same automobile accident. Thereafter, JG and CR presented – incredibly – on the exact same date, May 16, 2017, at Accelerated Healing for initial examinations by Lyons. JG and CR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JG and CR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided JG and CR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xiv)   On June 3, 2017, three insureds – YR, JR, and IY – were involved in the same accident. Thereafter, YR, JR, and IY presented – incredibly – on the exact same

48

<u>date</u>, June 12, 2017, at Accelerated Healing for initial examinations by Lyons. YR, JR, and IY were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that YR, JR, and IY suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided YR, JR, and IY with substantially identical back sprain "diagnoses", and recommended a substantially identical course of "treatment" for the three of them.

(xv)    On August 26, 2017, two insureds – KC and LP – were involved in the same automobile accident. Thereafter, KC and LP presented – incredibly – <u>on the exact same date</u>, September 7, 2017, at Accelerated Healing for initial examinations by Lyons. KC and LP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that KC and LP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Accelerated Healing and Lyons provided KC and LP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

120.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Accelerated Healing and Lyons frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

121.    Accelerated Healing and Lyons routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

122.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibit "1", Accelerated Healing and Lyons routinely falsely represented that the initial examinations entailed "low complexity" medical decision-making, when in fact: (i) the Insureds' problems were low severity soft tissue injuries such as sprains and strains, to the extent that they

had any problems at all as a result of any automobile accident; (ii) the examining chiropractor did not consider any significant number of diagnoses or management options; (iii) the examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information; and (iv) neither the Insureds' presenting problems – to the limited extent that they had any – nor the treatment plan offered by Accelerated and Lyons posed any risk of significant complications, morbidity, or mortality.

123.    In the claims for initial examinations identified in Exhibit "1", Accelerated Healing and Lyons routinely falsely represented that the initial examinations involved "low complexity" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

**e.    Misrepresentations Regarding Whether the Initial Examinations Were Conducted At All**

124.    In addition to the misrepresentations regarding the extent of medical decision-making, the extent of the physical examinations, the amount of time spent with Insureds and their families, and the severity of the Insureds' presenting problems, Accelerated Healing and Lyons routinely falsely represented that the putative initial examinations were conducted in the first instance.

125.    As noted above, Accelerated Healing and Lyons billed virtually all of their initial examinations using CPT code 99203, and thereby represented that they had performed a "detailed" physical examination.

50

126.     Similarly, Accelerated Healing and Lyons were aware that, in order for putative physical examinations to qualify as "detailed" examinations, they were required to, among other things, report the results of testing of the Insureds' vital signs.

127.     However, and in keeping with the fact that the initial examinations in the claims identified in Exhibit "1" were never provided in the first instance, Accelerated Healing and Lyons often never actually tested the vital signs of the Insureds they purported to examine.

128.     In order to create the false appearance that they, in fact, provided "detailed" physical examinations to the Insureds in the claims identified in Exhibit "1", Accelerated Healing and Lyons falsely purported to report the results of testing the Insureds' vital signs during the initial examinations, despite the fact that these tests oftentimes were never performed in the first instance.

129.     It is extremely improbable – to the point of medical impossibility – that a massive number of the Insureds examined by Accelerated Healing and Lyons would present with identical blood pressure and pulse rates during initial examinations.

130.     Even so, in many of the initial examination reports in the claims identified in Exhibit "1", Accelerated Healing and Lyons falsely reported that the Insureds had the following, identical blood pressure and pulse rates:

(i)      BP 120/60

(ii)     Pulse 62

131.     These phony, identical "findings" were reported in a statistically impossible of initial examination reports created by Accelerated Healing and Lyons, including but not limited to reports for the following Insureds on the following dates:

(i)      JD, on December 16, 2013;

(ii)     CF, on March 13, 2014;

(iii)    MN, on July 23, 2015;

(iv)    IM, on September 15, 2015;

(v)     BS, on September 18, 2015;

(vi)    FE, on October 5, 2015;

(vii)   JC, on January 19, 2016;

(viii)  FB, on February 9, 2016;

(ix)    JM, on April 20, 2016;

(x)     VN, on May 5, 2016;

(xi)    MN, on May 23, 2016;

(xii)   KD, on May 26, 2016;

(xiii)  RR, on August 30, 2016;

(xiv)   BA, on October 12, 2016;

(xv)    IR, on November 3, 2016;

(xvi)   DM, on November 3, 2016;

(xvii)  NL, on November 3, 2016;

(xviii) MI, on December 14, 2016;

(xix)   MD, on December 21, 2016;

(xx)    MR, on January 18, 2017;

(xxi)   KH, on January 24, 2017;

(xxii)  AA, on February 20, 2017;

(xxiii) CR, on May 16, 2017;

(xxiv)  YR, on June 12, 2017;

(xxv)   EF, on June 19, 2017;

(xxvi)  LP, on September 7, 2017;

(xxvii) KC, on September 7, 2017;

(xxviii)ER, on October 2, 2017;

(xxix)  DR, on October 17, 2017;

(xxx)   CS, on November 29, 2017;

(xxxi)  SG, on November 29, 2017;

(xxxii) JP, on December 1, 2017;

(xxxiii)MR, on December 19, 2017;

(xxxiv)DG, on December 27, 2017; and

(xxxv) AR, on May 29, 2018.

132.    These are only representative examples. Accelerated Healing and Lyons routinely purported to identify these same, identical, blood pressure and pulse rates in Insureds they purported to examine, to an extent that was statistically impossible.

133.    Moreover, the measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion".  Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

134.    A range of motion test consists of a measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a range of motion test, the chiropractor asks the patient to move his or her joints at various angles, or the chiropractor moves the joints. The chiropractor then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

53

135.    Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a chiropractor knows the extent of a given patient's joint impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion therefore is an essential component of the "hands-on" examination of a trauma patient.

136.    Accelerated Healing and Lyons purported to provide range of motion testing during virtually every initial examination that they purported to provide to Insureds.

137.    In actuality, and as with their phony blood pressure and pulse rate data, Accelerated Healing and Lyons simply fabricated range of motion data for the Insureds and included it in the initial examination reports in order to create the appearance of genuine, serious injuries, where none actually existed.

138.    For example, and as set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

139.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

140.    It is extremely improbable that two or more Insureds who were involved in the same underlying automobile accident would present to Accelerated Healing and Lyons with virtually identical range of motion deficits.

141.    It is even more improbable – to the point of impossibility – that this legitimately could occur over and over again.

142.    However – and in keeping with the fact that Accelerated Healing and Lyons simply falsified the "results" of their putative initial examinations in order to create the false appearance that the examinations legitimately had been performed in the first instance – Accelerated Healing and Lyons frequently falsely contended that two or more Insureds who had been involved in a single underlying automobile accident presented with virtually identical range of motion deficits, and often vital signs, upon examination.

143.    For example:

(i)    On November 27, 2013, two Insureds – GD and JD – were involved in the same automobile accident. On December 16, 2013, both GD and JD presented at Accelerated Healing for purported initial examinations by Lyons. It is extremely improbable that both GD and JD would display substantially identical, and quite severe, cervical range of motion deficits during examinations by Lyons more than two weeks after their accident. Even so, at the conclusion of the purported initial examinations, Lyons and Accelerated Healing falsely reported that both GD and JD had numerous, substantially identical, severe cervical range of motion deficits, including: (a) cervical flexion that was only 50% of normal; (b) cervical extension that was only 50% of normal; (c) left lateral cervical flexion that was only 37.5% of normal; and (d) right lateral cervical flexion that was only 50% of normal.

(ii)    On June 5, 2014, two Insureds – AC and VE – were involved in the same automobile accident. On June 10, 2014, both AC and VE presented at Accelerated Healing for purported initial examinations by Lyons. It is extremely improbable that both AC and VE would display substantially identical, and quite severe, cervical and lumbar range of motion deficits during examinations by Lyons five days after their accident, especially considering that VE was seen at Robert Wood Johnson University Hospital following the accident, where she denied experiencing any pain, displayed no lumbar or cervical spine symptoms, and received no lumbar or cervical spine diagnosis. Even so, at the conclusion of the purported initial examinations, Lyons and Accelerated Healing falsely reported that both AC and VE had numerous, substantially identical, severe cervical and lumbar range of motion deficits, including: (a) left cervical rotation that was only 43.75% of normal; (b) left lateral cervical flexion that was only 37.5% of normal; (c) right lateral cervical flexion that was only 50% of normal; and (d) lumbar extension that was only 50% of normal.

(iii)    On July 20, 2015, two Insureds – SA and MN – were involved in the same automobile accident. On July 23, 2015, both SA and MN presented at Accelerated Healing for purported initial examinations by Lyons. It is extremely improbable that both SA and MN would display substantially identical, and quite severe,

cervical range of motion deficits during examinations by Lyons after their accident. Even so, at the conclusion of the purported initial examinations, Lyons and Accelerated Healing falsely reported that both SA and MN had numerous, substantially identical, severe cervical range of motion deficits, including: (a) cervical flexion that was only 50% of normal; (b) left cervical rotation that was only 50% of normal; (c) right cervical rotation that was only 50% of normal; (d) left lateral cervical flexion that was only 37.5% of normal; and (e) right lateral cervical flexion that was only 50% of normal.

(iv)    Less than a year later, on May 16, 2016, SA and MN were involved in yet another automobile accident. Then, on May 23, 2016, SA and MN once again both presented at Accelerated Healing –on the exact same day – for purported initial examinations by Lyons. It is extremely improbable that both SA and MN would once again display substantially identical, and quite severe, range of motion deficits during examinations by Lyons a week after their second accident, especially considering that the police report indicated that no one was injured in the accident. Even so, at the conclusion of the purported initial examinations, Lyons and Accelerated Healing once again falsely reported that both SA and MN had numerous, substantially identical, severe cervical range of motion deficits, including: (a) cervical flexion that was only approximately 50% of normal; (b) cervical extension that was only 50% of normal; (c) left cervical rotation that was only approximately 50% of normal; (d) right cervical rotation that was only approximately 60% of normal; (e) left lateral cervical flexion that was only 50% of normal; and (f) right lateral cervical flexion that was only 62.5% of normal.

(v)    On September 16, 2015, two Insureds – MR and BS – were involved in the same automobile accident. On September 18, 2015, both MR and BS presented at Accelerated Healing for purported initial examinations by Lyons. It is extremely improbable that both MR and BS would display substantially identical, and quite severe, cervical range of motion deficits during examinations by Lyons after their accident. Even so, at the conclusion of the purported initial examinations, Lyons and Accelerated Healing falsely reported that both MR and BS had numerous, substantially identical, severe cervical range of motion deficits, including: (a) left cervical rotation that was only 37.5% of normal; (b) right cervical rotation that was only 43.75% of normal; and (c) left lateral cervical flexion that was only 37.5% of normal. What is more, and incredibly, Lyons and Accelerated Healing falsely reported that both MR and BS had identical blood pressure and pulse rates.

(vi)    On May 19, 2016, two Insureds – ED and KD – were involved in the same automobile accident. On May 24, 2016, ED presented at Accelerated Healing for a purported initial examination by Lyons, and on May 26, 2016, KD presented at Accelerated Healing for a purported initial examination by Lyons. It is extremely improbable that both ED and KD would display substantially identical, and quite severe, cervical range of motion deficits during examinations by Lyons after their accident, especially considering that ED was seen at John F. Kennedy Hospital following the accident, where he was found to have normal cervical range of

56

motion. Even so, at the conclusion of the purported initial examinations, Lyons and Accelerated Healing falsely reported that both ED and KD had numerous, substantially identical, severe cervical range of motion deficits, including: (a) left cervical rotation that was only 50% of normal; (b) left lateral cervical flexion that was only 37.5% of normal; and (c) right lateral cervical flexion that was only 50% of normal.

(vii)    On July 1, 2016, two Insureds – RP and CV – were involved in the same automobile accident. On July 8, 2016, both RP and CV presented at Accelerated Healing for purported initial examinations by Lyons. It is extremely improbable that both RP and CV would display substantially identical, and quite severe, lumbar range of motion deficits during examinations by Lyons a week after their accident, especially considering that RP was seen at Robert Wood Johnson University Hospital following the accident, where he displayed no lumbar spine symptoms and received no lumbar spine diagnosis. Even so, at the conclusion of the purported initial examinations, Lyons and Accelerated Healing falsely reported that both RP and CV had numerous, substantially identical, severe lumbar range of motion deficits, including: (a) lumbar flexion that was only 33.3% of normal; (b) lumbar extension that was only 50% of normal; (c) left lateral flexion that was only 50% of normal; and (d) right lateral flexion that was only 75% of normal. What is more, and incredibly, Lyons and Accelerated Healing falsely reported that both RP and CV had identical blood pressure and pulse rates.

(viii)   On October 22, 2016, <u>three</u> Insureds –NL, DM, and IR – were involved in the same automobile accident. On November 3, 2016, NL, DM, and IR all presented at Accelerated Healing for purported initial examinations by Lyons. It is extremely improbable that all three of NL, DM, and IR would display substantially identical, and quite severe, cervical and lumbar range of motion deficits during examinations by Lyons almost two weeks after their accident, especially considering that all three of them were seen at John F. Kennedy Hospital following the accident, where IR was found to have normal cervical range of motion, and DM was found to have no lumbar spine symptoms or complaints, and only mild cervical symptoms and complaints. Even so, at the conclusion of the purported initial examinations, Lyons and Accelerated Healing falsely reported that NL, DM, and IR all had numerous, substantially identical, severe cervical and lumbar range of motion deficits, including: (a) cervical flexion that was only about 50% of normal; (b) left cervical rotation that was only about 50% of normal; (c) right cervical rotation that was only about 50% of normal; (d) lumbar extension that was only 50% of normal; and (e) right lateral lumbar flexion that was only about 50% of normal. What is more, and incredibly, Lyons and Accelerated Healing falsely reported that NL, DM, and IR all had identical blood pressure and pulse rates.

(ix)     On May 12, 2017, two Insureds – JG and CR – were involved in the same automobile accident. On May 16, 2017, both JG and CR presented at Accelerated

Healing for purported initial examinations by Lyons. It is extremely improbable that both JG and CR would display substantially identical, and quite severe, cervical range of motion deficits during examinations by Lyons after their accident, especially considering that CR was seen at John F. Kennedy Hospital following the accident, where she displayed normal range of motion in her cervical spine. Even so, at the conclusion of the purported initial examinations, Lyons and Accelerated Healing falsely reported that both JG and CR had numerous, substantially identical, severe cervical range of motion deficits, including: (a) cervical flexion that was only 50% of normal; (b) cervical extension that was only 50% of normal; (c) left cervical rotation that was only 50% of normal; (d) right cervical rotation that was only 43.75% of normal; and (e) left lateral cervical flexion that was only 50% of normal.  What is more, and incredibly, Lyons and Accelerated Healing falsely reported that both JG and CR had identical blood pressure and pulse rates.

(x)     On August 26, 2017, two Insureds – KP and LP – were involved in the same automobile accident. On September 7, 2017, both KP and LP presented at Accelerated Healing for purported initial examinations by Lyons. It is extremely improbable that both KP and LP would display substantially identical, and quite severe, cervical and lumbar range of motion deficits during examinations by Lyons almost two weeks after their accident, especially considering that both KP and LP were seen at John F. Kennedy Hospital following the accident, where they displayed normal range of motion in their cervical and lumbar spines. Even so, at the conclusion of the purported initial examinations, Lyons and Accelerated Healing falsely reported that both KP and LP had numerous, substantially identical, severe cervical and lumbar range of motion deficits, including: (a) cervical flexion that was only 50% of normal; (b) left cervical rotation that was only 37.5% of normal; (c) right lateral cervical flexion that was only 50% of normal; and (d) lumbar extension that was only 50% of normal. What is more, and incredibly, Lyons and Accelerated Healing falsely reported that both KP and LP had identical blood pressure and pulse rates.

144.    What is more, and in keeping with the fact that Accelerated Healing and Lyons simply fabricated examination data for the Insureds they purported to treat during the initial examinations, the examination data reported by Accelerated Healing and Lyons frequently were contravened by contemporaneous reports from hospitals or other healthcare providers that treated the Insureds, to the limited extent that the Insureds presented at any hospitals at all following their accidents. For example:

(i)     On December 1, 2013, an Insured named LH was involved in an automobile accident. That same day, LH presented at Overlook Medical Center, where the

contemporaneous hospital records indicated that she had full, normal cervical range of motion. Though the contemporaneous hospital records indicated that LH suffered no cervical range of motion deficits as the result of her accident, following a purported initial examination of LH on July 10, 2014 – more than seven months after the accident – Lyons and Accelerated Healing falsely reported that LH suffered severe cervical range of motion deficits as the result of the accident, including cervical flexion that was only 66% of normal, cervical extension that was only 70% of normal, left cervical rotation that was only 50% of normal, right cervical rotation that was only 56% of normal, left lateral cervical flexion that was only 50% of normal, and right lateral cervical flexion that was only 37.5% of normal.

(ii)     On September 18, 2014, an Insured named JM was involved in an automobile accident. That same day, JM presented at John F. Kennedy Hospital, where the contemporaneous hospital records indicated that she complained of chest pain, but denied experiencing any neck or back pain, and that she had full, normal cervical and lumbar range of motion. Though the contemporaneous hospital records indicated that JM had no complaints of back or neck pain and suffered no cervical or lumbar range of motion deficits as the result of her accident, following a purported initial examination of JM on October 3, 2014 – two weeks after the accident – Lyons and Accelerated Healing falsely reported that JM suffered severe cervical and lumbar range of motion deficits as the result of the accident, including cervical flexion that was only 50% of normal, cervical extension that was only 40% of normal, left cervical rotation that was only 50% of normal, right cervical rotation that was only 43.75% of normal, left lateral cervical flexion that was only 25% of normal, right lateral cervical flexion that was only 50% of normal, lumbar flexion that was only 38.9% of normal, and lumbar extension that was only 33.3% of normal.

(iii)    On May 31, 2016, an Insured named RM was involved in an automobile accident. On April 20, 2017, RM was examined by Douglas Spiel, M.D., who noted in his examination report that RM had full, normal range of motion in her lumbar spine. Just four days later, on April 24, 2017, Lyons and Accelerated Healing purported to provide RM with an initial examination, and falsely reported that RM suffered from severe lumbar range of motion deficits as the result of her accident, including lumbar flexion that was only 44.4% of normal, lumbar extension that was only 50% of normal, and left lateral lumbar flexion that was just 50% of normal.

(iv)    On August 6, 2016, an Insured named RG was involved in an automobile accident. That same day, RG presented at Robert Wood Johnson University Hospital, where the contemporaneous hospital records indicated that she had full, normal cervical and lumbar range of motion, and that she denied any back pain or injury. Though the contemporaneous hospital records indicated that RG suffered no cervical or lumbar range of motion deficits as the result of her accident, and that she had no back injury, following a purported initial examination of RG on

59

August 30, 2016 – more than three weeks after the accident – Lyons and Accelerated Healing falsely reported that RG suffered severe cervical and lumbar range of motion deficits as the result of the accident, including cervical flexion that was only 41.6% of normal, cervical extension that was only 40% of normal, left cervical rotation that was only 43.75% of normal, right cervical rotation that was only 37.5% of normal, left lateral cervical flexion that was only 37.5% of normal, right lateral cervical flexion that was only 50% of normal, lumbar flexion that was only 33.3% of normal, lumbar extension that was only 50% of normal, left lateral lumbar flexion that was only 50% of normal, right lateral lumbar flexion that was only 50% of normal.

(v)     On December 19, 2016, an Insured named AA was involved in an automobile accident. That same day, AA presented at John F. Kennedy Hospital, where the contemporaneous hospital records indicated that he complained of mild lower back pain, but that he had full, normal lumbar range of motion. Though the contemporaneous hospital records indicated that AA suffered no lumbar range of motion deficits as the result of his accident, following a purported initial examination of AA on January 3, 2017 – two weeks after the accident – Lyons and Accelerated Healing falsely reported that AA suffered severe lumbar range of motion deficits as the result of the accident, including lumbar flexion that was only 38.9% of normal, lumbar extension that was only 50% of normal, and left lateral lumbar flexion that was only 50% of normal.

(vi)    On December 30, 2016, an Insured named KR was involved in an automobile accident. That same day, KR presented at John F. Kennedy Hospital, where the contemporaneous hospital records indicated that she had full, normal lumbar range of motion, and no complaints of back pain or injury. Though the contemporaneous hospital records indicated that KR suffered no lumbar range of motion deficits as the result of her accident, and no back injuries, following a purported initial examination of KR on January 17, 2017, Lyons and Accelerated Healing falsely reported that KR suffered severe lumbar range of motion deficits as the result of the accident, including lumbar flexion that was only 38.8% of normal, and lumbar extension that was only 50% of normal.

(vii)   On May 13, 2017, an Insured named CR was involved in an automobile accident. That same day, CR presented at John F. Kennedy Hospital, where the contemporaneous hospital records indicated that she complained of mild neck pain but had full, normal cervical range of motion. Though the contemporaneous hospital records indicated that CR suffered no cervical range of motion deficits as the result of her accident, following a purported initial examination of CR on May 16, 2017, Lyons and Accelerated Healing falsely reported that CR suffered severe cervical range of motion deficits as the result of the accident, including cervical flexion that was only 50% of normal, cervical extension that was only 50% of normal, left cervical rotation that was only 50% of normal, right cervical rotation that was only 43.75% of normal, and left lateral cervical flexion that was only 50% of normal.

(viii)   On June 3, 2017, an Insured named JR was involved in an automobile accident. That same day, JR presented at John F. Kennedy Hospital, where the contemporaneous hospital records indicated that she had full, normal cervical and lumbar range of motion. Though the contemporaneous hospital records indicated that JR suffered no cervical or lumbar range of motion deficits as the result of her accident, following a purported initial examination of JR on June 12, 2017 – nine days after the accident – Lyons and Accelerated Healing falsely reported that JR suffered severe cervical and lumbar range of motion deficits as the result of the accident, including cervical flexion that was only 50% of normal, cervical extension that was only 40% of normal, left cervical rotation that was only 50% of normal, right cervical rotation that was only 50% of normal, left lateral cervical flexion that was only 37.5% of normal, right lateral cervical flexion that was only 50% of normal, lumbar flexion that was only 38.9% of normal, and lumbar extension that was only 50% of normal.

(ix)    On June 9, 2017, an Insured named MD was involved in an automobile accident. That same day, MD presented at John F. Kennedy Hospital, where the contemporaneous hospital records indicated that she had full, normal cervical and lumbar range of motion, and no complaints of back pain or injury. Though the contemporaneous hospital records indicated that MD suffered no cervical or lumbar range of motion deficits as the result of her accident, and no back injuries, following a purported initial examination of MD on June 12, 2017, Lyons and Accelerated Healing falsely reported that MD suffered severe cervical and lumbar range of motion deficits as the result of the accident, including cervical flexion that was only 50% of normal, cervical extension that was only 40% of normal, left cervical rotation that was only 50% of normal, right cervical rotation that was only 50% of normal, left lateral cervical flexion that was only 37.5% of normal, right lateral cervical flexion that was only 50% of normal, lumbar flexion that was only 44.4% of normal, lumbar extension that was only 50% of normal, and left lateral lumbar flexion that was just 50% of normal.

(x)     On November 17, 2017, an Insured named DJ was involved in an automobile accident. That same day, DJ presented at John F. Kennedy Hospital, where the contemporaneous hospital records indicated that she had full, normal cervical and lumbar range of motion, and denied any back injury. Thereafter, DJ was provided with a comprehensive physical examination by Joseph Corona, M.D. on November 21, 2017, followed by two follow-up examinations by Dr. Corona on December 5, 2017 and January 3, 2018, in which Dr. Corona noted injuries to DJ's leg, but no injuries to her back. Though the contemporaneous hospital records and Dr. Corona's records indicated that DJ suffered no back injury or lumbar range of motion deficits as the result of her accident, following a purported initial examination of DJ on February 20, 2017 – two months after the accident – Lyons and Accelerated Healing falsely reported that DJ suffered severe lumbar range of motion deficits as the result of the accident, including lumbar flexion that was just 61% of normal.

145.    These are only representative examples. In the claims for initial examinations identified in Exhibit "1", Accelerated Healing and Lyons routinely falsified the purported "results" of the initial examinations in order to falsely represent that the initial examinations were performed in the first instance, and to create a false justification for their charges for the initial examinations and the other Fraudulent Services that the Defendants purported to provide.

146.    Each such act of falsification constituted a separate violation of N.J.A.C. § 13:44E-2.2.

**2.    The Fraudulent Charges for Follow-Up Examinations**

147.    In addition to their fraudulent initial examinations, Accelerated Healing and Lyons purported to subject many Insureds in the claims identified in Exhibit "1" to multiple, fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

148.    Lyons purported to perform virtually all of the putative follow-up examinations at Accelerated Healing that are identified in Exhibit "1", which were then billed to GEICO under CPT code 99213, resulting in a charge of either $50.00 or $85.00 for each purported follow-up examination.

149.    In the claims for follow-up examinations identified in Exhibit "1", the charges for the follow-up examinations were fraudulent in that they misrepresented Accelerated Healing's eligibility to collect PIP Benefits in the first instance.

150.    In fact, Accelerated Healing never was eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither it nor the examinations were in compliance with the relevant laws and regulations governing healthcare practice in New Jersey.

151.    Accelerated Healing and Lyons' charges for follow-up examinations identified in Exhibit "1" also were fraudulent in that they misrepresented the nature, extent, and reimbursable amount of the follow-up examinations.

**a.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

152.    Pursuant to CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the Insured present with problems of low to moderate severity.

153.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

154.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)      Follow-up visit with 55–year–old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)    Outpatient visit with 37–year–old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)     Routine, follow-up office evaluation at a three-month interval for a 77–year–old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)      Follow-up visit for a 70–year–old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)     Quarterly follow-up office visit for a 45–year–old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80–year–old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

155.    Accordingly, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

156.    By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any injuries at all in their automobile accidents, the injuries were garden–variety soft tissue injuries such as sprains and strains.

157.    In keeping with the fact that the Insureds in the claims identified in Exhibit "1" almost never suffered any injuries more serious than garden–variety soft tissue injuries such as sprains and strains, in many of the claims identified in Exhibit "1" the Insureds did not seek treatment at any hospital as the result of their accidents.

158.    To the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

159.    Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved relatively low-impact collisions, and that no one was seriously injured in the underlying accidents, or injured at all.

160.    Soft tissue injuries virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four–week, eight–week, and 13–week marks.

161.    By the time the Insureds in the claims identified in Exhibit "1" presented to Accelerated Healing and Lyons for putative follow-up examinations, the Insureds either did not

have any genuine presenting problems at all as the result of their automobile accidents, or their presenting problems were minimal.

162.    Even so, in the claims for follow-up examinations identified in Exhibit "1", Accelerated Healing and Lyons routinely billed for their putative follow-up examinations under CPT code 99213, and thereby falsely represented that the Insureds continued to suffer from presenting problems of low to moderate severity, despite the fact that the purported examinations oftentimes were provided many months after the Insureds' automobile accidents, and long after any attendant soft tissue pain or other symptoms attendant to the automobile accidents would have resolved.

163.    For example:

(i)     On June 2, 2013, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three months of the accident. Even so, following a purported follow-up examination of JG on September 6, 2013 – more than three months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JG presented with problems of low to moderate severity at the follow-up examination.

(ii)    On November 27, 2013, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JD's vehicle was drivable following the accident. The police report further indicated that, although JD complained of pain to her head, JD refused medical attention at the scene. Nonetheless, later that day, JD traveled on her own to Overlook Medical Center Emergency Department. The contemporaneous hospital records indicated that JD complained of dull, achy neck pain and a headache. The hospital records further indicated that JD was briefly observed on an outpatient basis and discharged that same day with an acute cervical strain diagnosis. To the extent that JD experienced any health issues at all as the result of the accident, they were of low severity at the outset, and had completely resolved within four to five months of the accident. Even so,

following a purported follow-up examination of JD on April 4, 2014 – more than four months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JD presented with problems of low to moderate severity at the follow-up examination.

(iii)   On February 28, 2015, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JC's vehicle was drivable following the accident. The police report further indicated that JC complained of pain to his back and was transported to Somerset Medical Center Emergency Department following the accident. The contemporaneous hospital records indicated that JC complained of knee, wrist, and back pain. The hospital records further indicated that JC was briefly observed on an outpatient basis and discharged that same day with wrist and knee sprain, and lumbar strain diagnoses. To the extent that JC experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within thirty-four to thirty-eight months of the accident. Even so, following purported follow-up examinations of JC on December 27, 2017, February 14, 2018, and April 20, 2018 – three years after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that JC presented with problems of low to moderate severity at the follow-up examinations.

(iv)   On July 14, 2015, an Insured named FE was involved in an automobile accident. The contemporaneous police report indicated that FE's vehicle was drivable following the accident. The police report further indicated that FE was not injured and did not complain of any pain at the scene. In keeping with the fact that FE was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that FE experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within twenty-four to twenty-seven months of the accident. Even so, following purported follow-up examinations of FE on August 8, 2017, September 7, 2017, and October 2, 2017 – two years after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that FE presented with problems of low to moderate severity at the follow-up examinations.

(v)   On May 16, 2016, an Insured named MN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MN's vehicle was drivable following the accident. The police report further indicated that MN was not injured and did not complain of any pain at the scene. In keeping with the fact that MN was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that MN experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three to six

months of the accident. Even so, following purported follow-up examinations of MN on September 12, 2016, and November 7, 2016 – between three and six months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that MN presented with problems of low to moderate severity at the follow-up examinations.

(vi)     On May 16, 2016, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that SA's vehicle was drivable following the accident. The police report further indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that SA experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to four months of the accident. Even so, following purported follow-up examinations of SA by Lyons on July 27, 2016, and September 7, 2016 – between two and four months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that SA presented with problems of low to moderate severity at the follow-up examinations.

(vii)    On August 8, 2016, an Insured named KH was involved in an automobile accident. The contemporaneous police report indicated that KH's vehicle was drivable following the accident. The police report further indicated that KH was not injured and did not complain of any pain at the scene. In keeping with the fact that KH was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that KH experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within thirty to thirty-two months of the accident.  Even so, following purported follow-up examinations of KH on January 18, 2018, February 22, 2018, April 2, 2018, and May 3, 2018 – between thirty and thirty-two months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that KH presented with problems of low to moderate severity at the follow-up examinations.

(viii)   On December 20, 2016, an Insured named MV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MV's vehicle was drivable following the accident. The police report further indicated that, although MV complained of pain to her back, she refused medical attention at the scene. Following the accident Emergency Medical Services responded to the scene. The contemporaneous emergency medical services records indicated that MV complained of back pain and refused medical attention at the scene. Nonetheless, the following day, on December 21, 2016, MV traveled on her own to Saint Peter's University Hospital Emergency

67

Department. The contemporaneous hospital records indicated that, although MV complained of intermittent pain to her leg, MV denied any pain to her back. The hospital records further indicated that MV was briefly observed on an outpatient basis and discharged that same day without a formal diagnosis, only the notation that she had been involved in a motor vehicle accident. To the extent that MV experienced any health issues at all as the result of the accident, they were of low severity at the outset, and had completely resolved within eight to thirteen months of the accident. Even so, following purported follow-up examinations on September 12, 2017, October 19, 2017, November 14, 2017, and January 9, 2018 – between eight and thirteen months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that MV presented with problems of low to moderate severity at the follow-up examinations.

(ix)    On December 20, 2016, an Insured named GV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that GV's vehicle was drivable following the accident. The police report further indicated that GV was not injured and did not complain of any pain at the scene. The following day, on December 21, 2016, GV traveled on her own to Saint Peter's University Hospital Emergency Department. The contemporaneous hospital records indicated that GV complained of intermittent pain to her ankle and denied any pain to her back. The hospital records further indicated that GV was briefly observed on an outpatient basis and discharged that same day without a formal diagnosis, only with the notation that she had been involved in a motor vehicle accident. To the extent that GV experienced any health issues at all as the result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination on March 16, 2017 – between two and three months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that GV presented with problems of low to moderate severity at the follow-up examination.

(x)    On January 9, 2017, an Insured named HS was involved in an automobile accident. The contemporaneous police report indicated that HS's vehicle was struck by a vehicle backing out of a driveway into the street. The police report further indicated that HS was not injured and did not complain of any pain at the scene. In keeping with the fact that HS was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that HS experienced any health issues at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination on March 6, 2017 – two months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that HS presented with problems of low to moderate severity at the follow-up examination.

68

(xi)     On January 12, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MR experienced any health issues at all as a result of the accident, they were of low severity at the outset, and had completely resolved within four to six months after the accident. Even so, following purported follow-up examinations on May 31, 2017, and June 27, 2017 – between four and six months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that MR presented with problems of low to moderate severity at the follow-up examinations.

(xii)    On March 13, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within thirteen to seventeen months of the accident. Even so, following purported follow-up examinations of AS on May 10, 2018, June 7, 2018, and July 20, 2018 – more than <u>one year</u> after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that AS presented with problems of low to moderate severity at the follow-up examinations.

(xiii)   On March 13, 2017, an Insured named AO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that AO's vehicle was drivable following the accident. The police report further indicated that AO was not injured and did not complain of any pain at the scene. In keeping with the fact that AO was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that AO experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within twelve to sixteen months of the accident. Even so, following purported follow-up examinations of AO on April 6, 2018, May 11, 2018, and July 12, 2018 – more than <u>one year</u> after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that AO presented with problems of low to moderate severity at the follow-up examinations.

(xiv)   On May 19, 2017, an Insured named JR was involved in an automobile accident. The contemporaneous police report indicated that JR's vehicle was drivable following the accident. The police report further indicated that JR was not injured and did not complain of any pain at the scene. In keeping with the fact that JR was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that JR experienced any health issues at all as a result of the accident, they were of low severity at the outset. Even so, following a purported follow-up examination on July 12, 2017 – between one and two months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that JR presented with problems of low to moderate severity at the follow-up examinations.

(xv)   On July 14, 2017, an Insured named BJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that BJ's vehicle was drivable following the accident. The police report further indicated that BJ was not injured and did not complain of any pain at the scene. Nonetheless, later that day BJ traveled on her own to Family Care, and Family Care conducted an independent physical examination of BJ. The contemporaneous Family Care records indicated that BJ complained of back, neck, and knee pain. The Family Care records further indicated that BJ was diagnosed with cervical and lumbar strain, and a mild knee contusion. To the extent that BJ experienced any health issues at all as a result of the accident, they were of low severity at the outset, and had completely resolved within nine to twelve months of the accident. Even so, following purported follow-up examinations on April 17, 2018, May 15, 2018, June 12, 2018, and July 11, 2018 – <u>one year</u> after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that BJ presented with problems of low to moderate severity at the follow-up examinations.

(xvi)   On August 1, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that RM's vehicle was drivable following the accident. The police report further indicated that RM complained of pain to his neck and was transported to Saint Peters University Hospital Emergency Department following the accident. The contemporaneous hospital records indicated that RM was briefly observed on an outpatient basis and discharged that same day with a muscle strain diagnosis. To the extent that RM experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within eight to eleven months of the accident. Even so, following purported follow-up examinations on April 27, 2018, May 24, 2018, and June 27, 2018 – between eight and eleven months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that RM presented with problems of low to moderate severity at the follow-up examinations.

70

(xvii)   On September 1, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination on November 20, 2017 – between two and three months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MB presented with problems of low to moderate severity at the follow-up examination.

(xviii)   On September 26, 2017, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that ER's vehicle was drivable following the accident. The police report further indicated that ER complained of pain to her back and was transported to New York Presbyterian Hospital Emergency Department following the accident. The contemporaneous hospital records indicated that ER complained of achy pain to her lower back. The hospital records further indicated that ER was briefly observed on an outpatient basis and discharged that same day with a lower back pain diagnosis. To the extent that ER experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within five to nine months of the accident. Even so, following purported follow-up examinations on March 7, 2018, April 4, 2018, May 1, 2018, and June 12, 2018 – between five and nine months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that ER presented with problems of low to moderate severity at the follow-up examinations.

(xix)   On October 26, 2017, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within six to eight months of the accident. Even so, following purported follow-up examinations on May 11, 2018, and June 19, 2018 – between six and eight months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that AR presented with problems of low to moderate severity at the follow-up examinations.

(xx)   On February 23, 2018, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MG's vehicle was drivable following the accident. The police report further indicated that MG was not injured and did not complain of any pain at the scene. In keeping with the fact that MG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination on May 2, 2018 – between two and three months after the accident – Lyons and Accelerated Healing billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that MG presented with problems of low to moderate severity at the follow-up examination.

164.   These are only representative examples. In many of the claims for follow-up examinations billed under CPT code 99213 that are identified in Exhibit "1", Accelerated Healing and Lyons falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds either did not have any genuine problems at all as the result of their automobile accidents at the time of the follow-up examinations – which often were at least several months after the accidents – or else their presenting problems were minimal.

165.   In the claims for follow-up examinations billed under CPT code 99213 identified in Exhibit "1", Accelerated Healing and Lyons routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for their charges for the examinations under CPT code 99213, because follow-up examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

166.   In the claims for follow-up examinations identified in Exhibit "1", Accelerated Healing and Lyons also routinely falsely represented that the Insureds presented with problems of low to moderate severity, in order to create a false basis for the other medically unnecessary Fraudulent Services that the Defendants purported to provide, including additional follow-up

examinations, chiropractic services, and physical therapy services.

**b.**      **Misrepresentations Regarding the Amount of Time Spent on the Follow-Up Examinations**

167.    What is more, in every claim for follow-up examinations identified in Exhibit "1" that were billed under CPT code 99213, Accelerated Healing and Lyons misrepresented the amount of time that was spent on the follow-up examinations.

168.    Pursuant to the Fee Schedule, the use of CPT code 99213 to bill for a follow-up examination represents that the physician who performed the examination spent at least 15 minutes of face-to-face time with the patient or the patient's family.

169.    As set forth in Exhibit "1", Accelerated Healing and Lyons submitted virtually all of their billing for follow-up examinations under CPT code 99213, and thereby represented that the chiropractors who purported to perform the follow-up examinations – virtually always Lyons – spent 15 minutes of face-to-face time with the Insureds or the Insureds' families during the examinations.

170.    Rather, in the claims for follow-up examinations identified in Exhibit "1", the follow-up examinations did not entail more than 5–10 minutes of face-to-face time between the examining chiropractors and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

171.    For instance, and in keeping with the fact that the follow-up examinations allegedly provided through Accelerated Healing did not entail more than 5–10 minutes of face-to-face time with the Insureds or their families, Accelerated Healing and Lyons used template forms in purporting to conduct the follow-up examinations.

172.    The template forms that Accelerated Healing and Lyons used in purporting to conduct the follow-up examinations set forth a very limited range of examination parameters.

173.     The only face-to-face time between the examining chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and very brief examination of the Insureds' musculoskeletal systems.

174.     These brief interviews and examinations did not require Lyons, or any other chiropractor associated with Accelerated Healing, to spend more than 5–10 minutes of face-to-face time with the Insureds or their families.

175.     In the claims for follow-up examinations identified in Exhibit "1", Accelerated Healing and Lyons falsely represented that the examinations involved at least 15 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99213, because examinations billable under CPT code 99213 are reimbursable at a higher rate than examinations that require less time to perform.

**c.      Misrepresentations Regarding the Results of the Follow–Up Examinations**

176.     Furthermore, pursuant to the Fee Schedule, when Accelerated Healing and Lyons billed for their putative follow-up examinations under CPT code 99213, they represented that Lyons performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

177.     In actuality, however, in the claims for follow-up examinations identified in Exhibit "1", Accelerated Healing and Lyons did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

178.     Instead, following their purported follow-up examinations, Accelerated Healing and Lyons simply reiterated the false boilerplate "diagnoses" from the Insureds' initial

examinations and recommended that the Insureds continue to return for additional medically unnecessary follow-up examinations and chiropractic services, despite the fact that the Insureds already had received extensive amounts of chiropractic services that supposedly had not resolved their purported symptoms.

179.    For example:

(i)      On June 2, 2013, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within three to four months of the accident. Even so, following a purported follow-up examination of JG by Lyons on September 6, 2013 – more three months after the accident – Lyons and Accelerated Healing falsely reported that JG continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that JG continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that JG had been receiving such services at Accelerated Healing for more than two and a half months and they supposedly had not resolved JG's purported symptoms.

(ii)     On November 27, 2013, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JD's vehicle was drivable following the accident. The police report further indicated that, although JD complained of pain to her head, JD refused medical attention at the scene. Nonetheless, later that day, JD traveled on her own to Overlook Medical Center Emergency Department. The contemporaneous hospital records indicated that JD complained of dull, achy neck pain and a headache. The hospital records further indicated that JD was briefly observed on an outpatient basis and discharged that same day with an acute cervical strain diagnosis. To the extent that JD experienced any health issues at all as the result of the accident, they were of low severity at the outset, and had completely resolved within four to five months of the accident. Even so, following a purported follow-up examination of JD by Lyons on April 4, 2014 – more than four months after the accident – Lyons and Accelerated Healing falsely reported that JD continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that JD continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that JD had been receiving such services at Accelerated Healing for more than three

and a half months and they supposedly had not resolved JD's purported symptoms.

(iii)     On February 28, 2015, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JC's vehicle was drivable following the accident. The police report further indicated that JC complained of pain to his back and was transported to Somerset Medical Center Emergency Department following the accident. The contemporaneous hospital records indicated that JC complained of knee, wrist, and back pain. The hospital records further indicated that JC was briefly observed on an outpatient basis and discharged that same day with wrist and knee sprain, and lumbar strain diagnoses. To the extent that JC experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within thirty-one to thirty-two months of the accident. Even so, following a purported follow-up examination of JC by Lyons on October 11, 2017 – more than thirty-one months after the accident – Lyons and Accelerated Healing falsely reported that JC continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that JC continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that JC had been receiving such services at Accelerated Healing for more than twenty months and they supposedly had not resolved JC's purported symptoms.

(iv)     On July 14, 2015, an Insured named FE was involved in an automobile accident. The contemporaneous police report indicated that FE's vehicle was drivable following the accident. The police report further indicated that FE was not injured and did not complain of any pain at the scene. In keeping with the fact that FE was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that FE experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within twenty-six to twenty-seven months of the accident. Even so, following purported a follow-up examination of FE by Lyons on October 2, 2017 – more than <u>two years</u> after the accident – Lyons and Accelerated Healing falsely reported that FE continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that FE continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that FE had been receiving such services at Accelerated Healing for more than twenty-three months and they supposedly had not resolved FE's purported symptoms.

(v)     On May 16, 2016, an Insured named MN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MN's vehicle was drivable following the accident. The police report further indicated that MN was not injured and did not complain of any pain at the scene. In keeping with the fact that MN was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that MN experienced any health problems at all as a result of the accident, they were

of low severity at the outset, and had completely resolved within five to six months of the accident. Even so, following a purported follow-up examination of MN by Lyons on November 7, 2016 – more than five months after the accident – Lyons and Accelerated Healing falsely reported that MN continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that MN continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that MN had been receiving such services at Accelerated Healing for more than five and a half months and they supposedly had not resolved MN's purported symptoms.

(vi)    On May 16, 2016, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that SA's vehicle was drivable following the accident. The police report further indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that SA experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported follow-up examination of SA by Lyons on July 27, 2016 – more than two months after the accident – Lyons and Accelerated Healing falsely reported that SA continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that SA continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that SA had been receiving such services at Accelerated Healing for more than two months and they supposedly had not resolved SA's purported symptoms.

(vii)   On August 8, 2016, an Insured named KH was involved in an automobile accident. The contemporaneous police report indicated that KH's vehicle was drivable following the accident. The police report further indicated that KH was not injured and did not complain of any pain at the scene. In keeping with the fact that KH was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that KH experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within fourteen months of the accident.  Even so, following a purported follow-up examination of KH on October 9, 2017 – more than one year after the accident – Lyons and Accelerated Healing falsely reported that KH continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that KH continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that KH had been receiving such services at Accelerated Healing for more than eleven and a half months and they supposedly had not resolved KH's purported symptoms.

(viii)  On December 20, 2016, an Insured named MV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MV's vehicle was drivable following the accident. The

police report further indicated that, although MV complained of pain to her back, she refused medical attention at the scene. Following the accident Emergency Medical Services responded to the scene. The contemporaneous emergency medical services records indicated that MV complained of back pain and refused medical attention at the scene. Nonetheless, the following day, on December 21, 2016, MV traveled on her own to Saint Peter's University Hospital Emergency Department. The contemporaneous hospital records indicated that, although MV complained of intermittent pain to her leg, MV denied any pain to her back. The hospital records further indicated that MV was briefly observed on an outpatient basis and discharged that same day without a formal diagnosis, only the notation that she had been involved in a motor vehicle accident. To the extent that MV experienced any health issues at all as the result of the accident, they were of low severity at the outset, and had completely resolved within twelve to thirteen months of the accident. Even so, following a purported follow-up examination on January 9, 2018 – between twelve and thirteen months after the accident – Lyons and Accelerated Healing falsely reported that MV continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that MV continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that MV had been receiving such services at Accelerated Healing for more than eleven months and they supposedly had not resolved MV's purported symptoms.

(ix)     On January 12, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MR experienced any health issues at all as a result of the accident, they were of low severity at the outset, and had completely resolved within five to six months after the accident. Even so, following a purported follow-up examination on June 27, 2017 – between five and six months after the accident – Lyons and Accelerated Healing falsely reported that MR continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that MR continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that MR had been receiving such services at Accelerated Healing for more than five months and they supposedly had not resolved MR's purported symptoms.

(x)      On March 13, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident,

they were of low severity at the outset, and had completely resolved within sixteen to seventeen months of the accident. Even so, following a purported follow-up examination of AS on July 20, 2018 – more than <u>one year</u> after the accident –  Lyons and Accelerated Healing falsely reported that AS continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that AS continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that AS had been receiving such services at Accelerated Healing for more than fifteen months and they supposedly had not resolved AS's purported symptoms.

(xi)   On March 13, 2017, an Insured named AO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that AO's vehicle was drivable following the accident. The police report further indicated that AO was not injured and did not complain of any pain at the scene. In keeping with the fact that AO was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that AO experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within thirteen to fourteen months of the accident. Even so, following a purported follow-up examination of AO on May 11, 2018 – more than <u>one year</u> after the accident – Lyons and Accelerated Healing falsely reported that AO continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that AO continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that AO had been receiving such services at Accelerated Healing for more than thirteen months and they supposedly had not resolved AO's purported symptoms.

(xii)   On July 14, 2017, an Insured named BJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that BJ's vehicle was drivable following the accident. The police report further indicated that BJ was not injured and did not complain of any pain at the scene. Nonetheless, later that day BJ traveled on her own to Family Care, and Family Care conducted an independent physical examination of BJ. The contemporaneous Family Care records indicated that BJ complained of back, neck, and knee pain. The Family Care records further indicated that BJ was diagnosed with cervical and lumbar strain, and a mild knee contusion. To the extent that BJ experienced any health issues at all as a result of the accident, they were of low severity at the outset, and had completely resolved within eight to nine months of the accident. Even so, following a purported follow-up examination on March 20, 2018 – between eight and  nine months after the accident – Lyons and Accelerated Healing falsely reported that BJ continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that BJ continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that BJ had been receiving such services at Accelerated Healing for more than seven months and they supposedly had not resolved BJ's purported symptoms.

(xiii)   On August 1, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that RM's vehicle was drivable following the accident. The police report further indicated that RM complained of pain to his neck and was transported to Saint Peters University Hospital Emergency Department following the accident. The contemporaneous hospital records indicated that RM was briefly observed on an outpatient basis and discharged that same day with a muscle strain diagnosis. To the extent that RM experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within five to six months of the accident. Even so, following a purported follow-up examination on January 18, 2018 – between five and six months after the accident – Lyons and Accelerated Healing falsely reported that RM continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that RM continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that RM had been receiving such services at Accelerated Healing for more than five months and they supposedly had not resolved RM's purported symptoms.

(xiv)   On September 26, 2017, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that ER's vehicle was drivable following the accident. The police report further indicated that ER complained of pain to her back and was transported to New York Presbyterian Hospital Emergency Department following the accident. The contemporaneous hospital records indicated that ER complained of achy pain to her lower back. The hospital records further indicated that ER was briefly observed on an outpatient basis and discharged that same day with a lower back pain diagnosis. To the extent that ER experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within eight and nine months of the accident. Even so, following a purported follow-up examination on June 12, 2018 – between eight and nine months after the accident – Lyons and Accelerated Healing falsely reported that ER continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that ER continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that ER had been receiving such services at Accelerated Healing for more than eight months and they supposedly had not resolved ER's purported symptoms.

(xv)   On October 26, 2017, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, they were of low severity at the outset, and had completely resolved within seven to eight months of the accident. Even so,

following a purported follow-up examination on June 19, 2018 – between seven and eight months after the accident – Lyons and Accelerated Healing falsely reported that AR continued to suffer from pain and range of motion deficits as the result of the accident, and recommended that AR continue to receive medically unnecessary chiropractic services from Accelerated Healing, despite the fact that AR had been receiving such services at Accelerated Healing for more than seven months and they supposedly had not resolved AR's purported symptoms.

180.    These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", Accelerated Healing and Lyons routinely falsely represented that the Insureds continued to suffer from pain and other symptoms as the result of their automobile accidents, long after the accidents occurred.

181.    In the claims for follow-up examinations identified in Exhibit "1", Accelerated Healing and Lyons routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional follow-up examinations, chiropractic services, and physical therapy services.

182.    As set forth above, there are a substantial number of variables that affect whether, how, and to what extent a patient is injured in an automobile accident.

183.    What is more, there are a substantial number of variables that affect whether, how, how quickly, and to what extent a patient's injuries will resolve following an automobile accident.

184.    Even in the unlikely event that two or more patients who were involved in a single automobile accident did suffer substantially similar injuries in the accident, their injuries should resolve differently over time.

185.    In a legitimate clinical setting, it is improbable – to the point of impossibility –

that two or more patients who suffered soft tissue injuries in a single automobile accident would not only suffer substantially similar range of motion deficits as the result of the accident, but also would continue to exhibit substantially similar, and rather severe, range of motion deficits weeks or even months after their accident.

186.    Even so, and in keeping with the fact that Accelerated Healing and Lyons routinely falsified the results of their purported follow-up examinations in order to create a false justification for continued, medically unnecessary chiropractic services, Accelerated Healing and Lyons continued to report medically impossible, phony range of motion data for Insureds in connection with the purported follow-up examinations.

187.    For example:

(i)    On November 27, 2013, two Insureds – GD and JD – were involved in the same automobile accident. It is extremely improbable that both GD and JD not only would suffer substantially identical injuries in their accident, but that their injuries would resolve at such an identical rate that they would continue to exhibit substantially identical range of motion deficits many weeks or months after their accident. Even so, at the conclusion of purported follow-up examinations on January 17, 2014, Lyons and Accelerated Healing falsely reported that both GD and JD continued to exhibit substantially identical, and still rather severe, cervical range of motion deficits, including: (a) cervical flexion that was only 58.3% of normal; (b) cervical extension that was only 60% of normal; (c) left lateral cervical flexion that was only 44.4% of normal; and (d) right lateral cervical flexion that was only 55.5% of normal. Then, at the conclusion of additional purported follow-up examinations on February 20, 2014, Lyons and Accelerated Healing again falsely reported that both GD and JD continued to exhibit substantially identical, and still rather severe, cervical range of motion deficits, including: (a) cervical flexion that was only 66.6% of normal; (b) cervical extension that was only 70% of normal; (c) left lateral cervical flexion that was only 55.5% of normal; and (d) right lateral cervical flexion that was only 55.5% of normal.

(ii)    On June 5, 2014, two Insureds – AC and VE – were involved in the same automobile accident. It is extremely improbable that both AC and VE not only would suffer substantially identical injuries in their accident, but that their injuries would resolve at such an identical rate that they would continue to exhibit substantially identical range of motion deficits many weeks or months after their accident. Even so, at the conclusion of purported follow-up examinations on July

8, 2014, Lyons and Accelerated Healing falsely reported that both AC and VE continued to exhibit substantially identical, and still rather severe, cervical range of motion deficits, including: (a) cervical flexion that was only approximately 50-60% of normal; (b) cervical extension that was only 50-60% of normal; (c) left cervical rotation that was only 50% of normal; (d) right cervical rotation that was only approximately 56-62% of normal; (e) left lateral cervical flexion that was only 44.4% of normal; and (f) right lateral cervical flexion that was only 44.4% of normal. Then, at the conclusion of additional purported follow-up examinations on August 7, 2014, Lyons and Accelerated Healing again falsely reported that both AC and VE continued to exhibit substantially identical, and still rather severe, cervical range of motion deficits, including: (a) cervical flexion that was only approximately 50-60% of normal; (b) cervical extension that was only 50-60% of normal; (c) left cervical rotation that was only 56-62% of normal; (d) right cervical rotation that was only approximately 69-75% of normal; (e) left lateral cervical flexion that was only 55.5% of normal; and (f) right lateral cervical flexion that was only 44-55% of normal. What is more – and incredibly – at the conclusion of the purported August 7, 2014 follow-up examinations, Lyons and Accelerated Healing falsely reported that both AC and VE had identical blood pressure and pulse rates.

(iii)     On July 20, 2015, two Insureds – SA and MN – were involved in the same automobile accident. It is extremely improbable that both SA and MN not only would suffer substantially identical injuries in their accident, but that their injuries would resolve at such an identical rate that they would continue to exhibit substantially identical range of motion deficits many weeks or months after their accident. Even so, at the conclusion of purported follow-up examinations on October 29, 2015 – three months after the accident – Lyons and Accelerated Healing falsely reported that both SA and MN continued to exhibit substantially identical, and still rather severe, cervical range of motion deficits, including: (a) cervical flexion that was only 66% of normal; (b) cervical extension that was only 70-80% of normal; (c) left cervical rotation that was only 75% of normal; (d) right cervical rotation that was only 25% of normal; (e) left lateral cervical flexion that was only 55.5% of normal; and (f) right lateral cervical flexion that was only 66.6% of normal. Then, at the conclusion of additional purported follow-up examinations on February 2, 2016, Lyons and Accelerated Healing again falsely reported that both SA and MN continued to exhibit substantially identical cervical range of motion deficits, including: (a) cervical flexion that was only 75% of normal; (b) cervical extension that was only 90% of normal; (c) left lateral cervical flexion that was only 87.5% of normal; and (f) right lateral cervical flexion that was only 87.5% of normal.

(iv)     Less than a year later, on May 16, 2016, SA and MN were involved in yet another automobile accident. It is extremely improbable that both SA and MN not only would – once again – suffer substantially identical injuries in their accident, but that their injuries would resolve at such an identical rate that they would continue to exhibit substantially identical range of motion deficits many weeks or months

after their accident. Even so, at the conclusion of purported follow-up examinations on June 24, 2016, Lyons and Accelerated Healing once again falsely reported that both SA and MN continued to exhibit substantially identical, and still rather severe, cervical range of motion deficits, including: (a) cervical flexion that was only approximately 58-66% of normal; (b) cervical extension that was only 60% of normal; (c) left cervical rotation that was only approximately 56-62% of normal; (d) right cervical rotation that was only approximately 69-75% of normal; (e) left lateral cervical flexion that was only 55.5% of normal; and (f) right lateral cervical flexion that was only 55.5% of normal. Then, at the conclusion of additional purported follow-up examinations on February 2, 2016, Lyons and Accelerated Healing again falsely reported that both SA and MN continued to exhibit substantially identical cervical range of motion deficits, including: (a) cervical flexion that was only 66% of normal; (b) cervical extension that was only approximately 70-80% of normal; (c) left cervical rotation that was only approximately 62-68% of normal; (d) right cervical rotation that was only approximately 75-81% of normal; (e) left lateral cervical flexion that was only 66.6% of normal; and (f) right lateral cervical flexion that was only 66.6% of normal.

(v)     On September 16, 2015, two Insureds – MR and BS – were involved in the same automobile accident. It is extremely improbable that both MR and BS not only would suffer substantially identical injuries in their accident, but that their injuries would resolve at such an identical rate that they would continue to exhibit substantially identical range of motion deficits many weeks or months after their accident. Even so, at the conclusion of purported follow-up examinations on November 11, 2015, Lyons and Accelerated Healing falsely reported that both MR and BS continued to exhibit substantially identical, and still rather severe, cervical range of motion deficits, including: (a) cervical flexion that was only approximately 58-66% of normal; (b) cervical extension that was only approximately 60-70% of normal; (c) left cervical rotation that was only 62.5% of normal; (d) right cervical rotation that was only approximately 68-75% of normal; and (e) left lateral cervical flexion that was only 55.5% of normal. What is more – and incredibly – at the conclusion of the purported November 11, 2015 follow-up examinations, Lyons and Accelerated Healing falsely reported that both MR and BS had identical blood pressure and pulse rates.   Then, at the conclusion of additional purported follow-up examinations on December 8, 2015, Lyons and Accelerated Healing again falsely reported that both MR and BS continued to exhibit substantially identical, and still rather severe, cervical and lumbar range of motion deficits, including: (a) cervical flexion that was only approximately 58-66% of normal; (b) cervical extension that was only 70-80% of normal; (c) left cervical rotation that was only 75% of normal; (d) right cervical rotation that was only 81-87% of normal; (e) lumbar flexion that was only 55.5% of normal; and (f) lumbar extension that was only 83.3% of normal. What is more – and incredibly – at the conclusion of the purported December 8, 2015 follow-up examinations, Lyons and Accelerated Healing once again falsely reported that both MR and BS had identical blood pressure and pulse rates.

84

(vi)    On May 19, 2016, two Insureds – ED and KD – were involved in the same automobile accident. It is extremely improbable that both ED and KD not only would suffer substantially identical injuries in their accident, but that their injuries would resolve at such an identical rate that they would continue to exhibit substantially identical range of motion deficits many weeks or months after their accident. Even so, at the conclusion of purported follow-up examinations on June 21, 2016, Lyons and Accelerated Healing falsely reported that both ED and KD continued to exhibit substantially identical, and still rather severe, cervical range of motion deficits, including: (a) cervical flexion that was only approximately 50-58% of normal; (b) cervical extension that was only 50-60% of normal; (c) left cervical rotation that was only 56.25% of normal; (d) right cervical rotation that was only approximately 62-68% of normal; (e) left lateral cervical flexion that was only 44.4% of normal; and (f) right lateral cervical flexion that was only 44.4% of normal. Then, at the conclusion of additional purported follow-up examinations over the course of August 1-2, 2016, Lyons and Accelerated Healing again falsely reported that both ED and KD continued to exhibit substantially identical, and still rather severe, cervical range of motion deficits, including: (a) cervical flexion that was only 58.3% of normal; (b) cervical extension that was only 60-70% of normal; (c) left cervical rotation that was only 68.75% of normal; (d) right cervical rotation that was only approximately 75-81% of normal; (e) left lateral cervical flexion that was only 55.5% of normal; and (f) right lateral cervical flexion that was only 55.5% of normal.

(vii)   On October 22, 2016, two Insureds –NL and IR – were involved in the same automobile accident. It is extremely improbable that both NL and IR not only would suffer substantially identical injuries in their accident, but that their injuries would resolve at such an identical rate that they would continue to exhibit substantially identical range of motion deficits many weeks or months after their accident. Even so, at the conclusion of purported follow-up examinations over the course of December 7, 2016 and December 12, 2016, Lyons and Accelerated Healing falsely reported that both NL and IR continued to exhibit substantially identical, and still rather severe, cervical and lumbar range of motion deficits, including: (a) cervical flexion that was only approximately 58.3% of normal; (b) cervical extension that was only approximately 50-60% of normal; (c) left cervical rotation that was only 62.5% of normal; (d) right cervical rotation that was only 68.75% of normal; (e) left lateral cervical flexion that was only 44.4% of normal; (f) right lateral cervical flexion that was only 44.4% of normal;(g) lumbar flexion that was only approximately 44-50% of normal; (h) lumbar extension that was only 66.6% of normal; (i) left lateral lumbar flexion that was only 80% of normal; and (j) right lateral lumbar flexion that was only 80% of normal. Then, at the conclusion of additional purported follow-up examinations over the course of January 4, 2017 and January 11, 2017, Lyons and Accelerated Healing again falsely reported that both NL and IR continued to exhibit substantially identical, and still rather severe, cervical and lumbar range of motion deficits, including: (a) cervical flexion that was only 66% of normal; (b) cervical

extension that was only approximately 60-70% of normal; (c) left cervical rotation that was only 75% of normal; (d) right cervical rotation that was only approximately 81.25% of normal; (e) left lateral cervical flexion that was only 55.5% of normal; (f) right lateral cervical flexion that was only 55.5% of normal;(g) lumbar flexion that was only approximately 50-55% of normal; (h) lumbar extension that was only 83.3% of normal; (i) left lateral lumbar flexion that was only 80% of normal; and (j) right lateral lumbar flexion that was only 80% of normal. What is more – and incredibly – at the conclusion of the purported January 4, 2017 and January 11, 2017 follow-up examinations, Lyons and Accelerated Healing falsely reported that both NL and IR had identical blood pressure rates.

(viii)   On March 13, 2017, two Insureds – AS and AO – were involved in the same automobile accident. It is extremely improbable that both AS and AO not only would suffer substantially identical injuries in their accident, but that their injuries would resolve at such an identical rate that they would continue to exhibit substantially identical range of motion deficits many weeks or months after their accident. Even so, at the conclusion of purported follow-up examinations on June 12, 2017, Lyons and Accelerated Healing falsely reported that both AS and AO continued to exhibit substantially identical, and still rather severe, cervical and lumbar range of motion deficits, including: (a) cervical flexion that was only approximately 58-66% of normal; (b) cervical extension that was only approximately 60% of normal; (c) left cervical rotation that was only approximately 62-68% of normal; (d) right cervical rotation that was only 75% of normal; (e) left lateral cervical flexion that was only 55.5% of normal; (f) right lateral cervical flexion that was only 55.5% of normal;(g) lumbar flexion that was only approximately 56-66% of normal; (h) lumbar extension that was only 83.3% of normal; (i) left lateral lumbar flexion that was only 80% of normal; and (j) right lateral lumbar flexion that was only 80% of normal. What is more – and incredibly – at the conclusion of the purported June 12, 2017 follow-up examinations, Lyons and Accelerated Healing falsely reported that both AS and AO had identical blood pressure rates.  Then, at the conclusion of additional purported follow-up examinations on July 11, 2017, Lyons and Accelerated Healing again falsely reported that both AS and AO continued to exhibit numerous, substantially identical, and still rather severe, cervical and lumbar range of motion deficits, including: (a) cervical flexion that was only 66% of normal; (b) cervical extension that was only 58.3% of normal; (c) left lateral cervical flexion that was only 66.6% of normal; (d) right lateral cervical flexion that was only 66.6% of normal;(e) lumbar flexion that was only approximately 66-72% of normal; (f) lumbar extension that was only 83.3% of normal; and (g) left lateral lumbar flexion that was only 80% of normal.

(ix)   On August 26, 2017, two Insureds – KP and LP – were involved in the same automobile accident. It is extremely improbable that both KP and LP not only would suffer substantially identical injuries in their accident, but that their injuries would resolve at such an identical rate that they would continue to exhibit

substantially identical range of motion deficits many weeks or months after their accident. Even so, at the conclusion of purported follow-up examinations on October 5, 2017, Lyons and Accelerated Healing falsely reported that both KP and LP continued to exhibit substantially identical, and still rather severe, cervical and lumbar range of motion deficits, including: (a) cervical flexion that was only 58.3% of normal; (b) cervical extension that was only approximately 40-50% of normal; (c) left cervical rotation that was only 50% of normal; (d) right cervical rotation that was only 56.25% of normal; (e) left lateral cervical flexion that was only approximately 45-55% of normal; (f) right lateral cervical flexion that was only approximately 45-55% of normal; and (g) lumbar flexion that was only 50% of normal.

188. These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", Accelerated Healing and Lyons routinely falsified the purported "results" of the follow-up examinations in order to falsely represent that the follow-up examinations were performed in the first instance, and to create a false justification for their charges for the other Fraudulent Services that the Defendants purported to provide.

189. Each such act of falsification constituted a separate violation of N.J.A.C. § 13:44E-2.2.

**d.     Misrepresentations Regarding the Reimbursability of Follow-Up Examinations**

190. Not only did the Defendants routinely falsely represent that their putative follow-up examinations involved presenting problems of low to moderate severity, and not only did they misrepresent the results of the follow-up examinations, but Accelerated Healing and Lyons also routinely misrepresented the reimbursability of the follow-up examinations.

191. As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A–4.6; N.J.A.C. 11:3–29.6.

192. The No-Fault Laws and the Fee Schedule provide that follow-up examinations may only be billed twice in any 30-day period, and may only be billed contemporaneously with

chiropractic and/or physical therapy treatments if one of the following four circumstances is present:

(i)     there is a definite measurable change in the patient's condition requiring significant change in the treatment plan;

(ii)    the patient fails to respond to treatment, requiring a change in the treatment plan;

(iii)   the patient's condition becomes permanent and stationary, or the patient is ready for discharge; or

(iv)    it is medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

See N.J.A.C. 11:3–29.4(n).

193.   Even so, Accelerated Healing and Lyons routinely billed for follow-up examinations contemporaneously with chiropractic treatments, despite: (i) the absence of a definite measurable change in the patient's condition requiring significant change in the treatment plan; (ii) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patient's condition became permanent, or a situation in which the patient was ready for discharge; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

194.   For example:

(i)     Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named EE on November 26, 2012, January 4, 2013, January 15, 2013, January 31, 2013, February 7, 2013, March 11, 2013, April 11, 2013, May 8, 2013, and June 6, 2013, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to

provide evaluation services over and above those normally provided during the therapeutic services.

(ii)     Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named JH on July 9, 2013, August 8, 2013, September 12, 2013, November 4, 2013, and December 9, 2013, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iii)    Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named PS on December 19, 2013, January 22, 2014, February 26, 2014, April 1, 2014, May 6, 2014, June 11, 2014, July 15, 2014, August 26, 2014, October 8, 2014, November 5, 2014, December 9, 2014, January 7, 2015, and February 4, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iv)     Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named JD on January 17, 2014, February 20, 2014, and April 4, 2014, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(v)      Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named GD on January 17, 2014, February 20, 2014, and March 27, 2014, despite: (a) the absence of any definite measurable

change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vi)     Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named CT on August 27, 2014, September 26, 2014, December 29, 2014, February 5, 2015, March 11, 2015, April 10, 2015, and May 5, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vii)    Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named DF on December 17, 2014, January 28, 2015, February 27, 2015, and April 1, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(viii)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named AH on August 25, 2015, September 22, 2015, October 20, 2015, November 24, 2015, December 28, 2015, January 25, 2016, February 23, 2016, and June 8, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the

therapeutic services.

(ix) Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named AB on September 18, 2014, February 26, 2015, April 1, 2015, April 28, 2014, June 4, 2015, June 30, 2015, July 27, 2015, August 31, 2015, and October 6, 2015, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(x) Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named BS on October 14, 2015, November 11, 2015, December 8, 2015, January 5, 2016, February 2, 2016, March 11, 2016, April 6, 2016, May 5, 2016, June 16, 2016, July 12, 2016, August 11, 2016, and September 7, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xi) Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named RM on December 1, 2015, December 29, 2015, and January 26, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xii) Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named ME on February 2, 2016, March 2, 2016, March 30, 2016, April 29, 2016, and May 24, 2016, despite: (a) the absence

of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xiii)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named AC on February 3, 2016, and March 1, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xiv)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named BC on February 3, 2016, and March 1, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xv)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named CC on February 3, 2016, and March 1, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xvi)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations

they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named KM on February 25, 2016, April 6, 2016, May 12, 2016, June 30, 2016, August 1, 2016, and September 20, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xvii)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named JC on March 21, 2016, April 20, 2016, and May 18, 2016, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xviii)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named BA on November 7, 2016, December 6, 2016, January 3, 2017, January 30, 2017, February 27, 2017, March 27, 2017, and May 3, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xix)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named KH on November 16, 2016, December 15, 2016, January 11, 2017, February 16, 2017, March 22, 2017, April 20, 2017, May 18, 2017, June 21, 2017, July 17, 2017, and September 11, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became

permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xx)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named TB on November 16, 2016, December 14, 2016, January 11, 2017, February 8, 2017, March 8, 2017, April 5, 2017, May 9, 2017, June 12, 2017, July 10, 2017, August 7, 2017, September 6, 2017, and October 5, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxi)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named CG on January 9, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxii)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named RV on February 13, 2017, March 15, 2017, April 12, 2017, May 11, 2017, June 13, 2017, July 10, 2017, August 16, 2017, and September 12, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxiii)   Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or

physical therapy services to an Insured named AA on March 15, 2017, April 13, 2017, May 10, 2017, June 8, 2017, and July 5, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxiv) Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named GV on June 13, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxv) Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named MV on June 13, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxvi) Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named MF on July 19, 2017, August 14, 2017, September 12, 2017, October 10, 2017, November 14, 2017, December 13, 2017, and January 10, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation

services over and above those normally provided during the therapeutic services.

(xxvii) Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named EF on July 20, 2017, August 15, 2017, September 12, 2017, October 10, 2017, November 16, 2017, December 14, 2017, January 11, 2018, and February 15, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxviii) Lyons and Accelerated Healing billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic treatments and/or physical therapy services to an Insured named MB on October 24, 2017, November 20, 2017, and December 19, 2017, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxix) Lyons and Accelerated Healing billed GEICO for the follow-up examination they purported to provide contemporaneously with chiropractic treatment and/or physical therapy services to an Insured named DG on January 22, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xxx) Lyons and Accelerated Healing billed GEICO for the follow-up examination that they purported to provide contemporaneously with chiropractic treatment and/or physical therapy services to an Insured named MP on June 25, 2018, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to

respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Lyons and Accelerated Healing were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

195.    These are only representative examples. In the claims for follow-up examinations identified in Exhibit "1", Accelerated Healing and Lyons virtually always billed for follow-up examinations that they purported to provide contemporaneously with chiropractic and/or physical therapy services, despite: (i) the absence of any definite measurable change in the patients' condition requiring significant change in the treatment plan; (ii) the absence of the patients' failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patients' conditions became permanent, or a situation in which the Defendants were preparing to discharge the patients; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

196.    Each and every time that Accelerated Healing and Lyons billed for a follow-up examination that they purported to provide contemporaneously with chiropractic and/or physical therapy services constituted a separate violation of N.J.S.A. § 39:6A–4.6, N.J.A.C. 11:3–29.6, and N.J.A.C. 11:3–29.4(n).

**3.    The Defendants' Fraudulent Charges for Chiropractic Services and Physical Therapy Services**

197.    The Defendants' fraudulent scheme was aimed, among other things, at providing as many chiropractic services and/or physical therapy services as possible to the Insureds, without regard for medical necessity or the Care Paths.

198. As set forth in Exhibit "1", based upon the phony, fabricated "diagnoses" that the Defendants provided during their fraudulent initial examinations and follow-up examinations, Accelerated Healing and Lyons purported to subject many Insureds to months of medically-unnecessary chiropractic services.

199. Similarly, and as set forth in Exhibit "1", Accelerated Healing, Lyons, and Davis purported to subject many Insureds to months of medically–unnecessary physical therapy services.

200. Lyons purported to perform virtually all of the chiropractic services that were billed to GEICO through Accelerated Healing.

201. Davis purported to perform virtually all of the physical therapy services that were billed to GEICO through Accelerated Healing.

202. Similarly, as set forth in Exhibit "1", Accelerated Healing, Lyons, and Davis typically billed the putative chiropractic and physical therapy services to GEICO under CPT codes 97001, 97010, 97014, 97035, 97110, 97112, 97124, 97140, 97162, 98940, 98943, and Health Care Common Procedure Coding System ("HCCPCS") code G0283.

203. Like the charges for the other Fraudulent Services, the charges for the chiropractic services and physical therapy services were fraudulent in that they were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' pre-determined treatment protocol in order to maximize the potential charges they could submit to GEICO.

a. **The Medically–Unnecessary Chiropractic Services and Physical Therapy Services**

204. Pursuant to the phony, fabricated "diagnoses" that Accelerated Healing and Lyons provided during their fraudulent initial examinations and follow-up examinations, Accelerated

Healing, Lyons, and Davis purported to subject many Insureds to months of medically-unnecessary chiropractic and physical therapy services.

205.    In the claims for chiropractic services identified in Exhibit "1", the charges for chiropractic services were fraudulent in that the chiropractic services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony results of the initial and follow-up examinations.

206.    Likewise, in the claims for physical therapy services identified in Exhibit "1", the charges for physical therapy services were fraudulent in that the physical therapy services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony results of the initial and follow-up examinations.

207.    As set forth above, to the extent that the Insureds in the claims identified in Exhibit "1" suffered any healthcare problems at all as the result of their relatively minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

208.    The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating at regular intervals why continued treatment is necessary beyond the four–week mark.

209.    The Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months, without any observable improvement. See 30 N.J.R. 4401(a).

210.    Accelerated Healing, Lyons, and Davis knew that – unless they could create a false basis to provide long-term, medically unnecessary chiropractic and physical therapy

services to the Insureds in the claims identified in Exhibit "1" – their ability to provide such long-term, medically unnecessary treatments would be limited by the Care Paths.

211.    Accordingly, Accelerated Healing, Lyons, and Davis used the phony, fabricated "diagnoses" provided during the fraudulent initial and follow-up examinations as a false basis to bill for months and months of medically unnecessary chiropractic treatment and/or physical therapy treatment in gross deviation from the Care Paths.

212.    Towards that end, at the conclusion of virtually every purported follow-up examination in the claims identified in Exhibit "1", the examining chiropractor – i.e., Lyons – would refer the Insureds back to Accelerated Healing for additional, medically unnecessary chiropractic "treatments" and/or physical therapy "treatments".

213.    In keeping with the fact that these referrals for continued chiropractic and/or physical therapy "treatments" were not predicated on medical necessity, Accelerated Healing's own records frequently indicated that the previous, extensive chiropractic and physical therapy "treatments" that the Insureds had received had not been effective in resolving their purported complaints.

214.    For example:

(i)    On June 2, 2013, an Insured named JG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JG's vehicle was drivable following the accident. The police report further indicated that JG was not injured and did not complain of any pain at the scene. In keeping with the fact that JG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that JG experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not require between six and seven months of chiropractic treatment. Even so, following purported follow-up examinations of JG on July 15, 2013, and September 6, 2013, Lyons and Accelerated Healing routinely directed that JG continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services JG previously had received supposedly had not resolved JG's purported symptoms. As a result of the medically unnecessary chiropractic directives by

Lyons and Accelerated Healing, JG received between six and seven months of purported chiropractic "treatment" at Accelerated Healing.

(ii)    On November 27, 2013, an Insured named JD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JD's vehicle was drivable following the accident. The police report further indicated that, although JD complained of pain to her head, JD refused medical attention at the scene. Nonetheless, later that day, JD traveled on her own to Overlook Medical Center Emergency Department. The contemporaneous hospital records indicated that JD complained of dull, achy neck pain and a headache. The hospital records further indicated that JD was briefly observed on an outpatient basis and discharged that same day with an acute cervical strain diagnosis. To the extent that JD experienced any health issues at all as the result of the accident, the injuries were soft tissue injuries that did not require five months of chiropractic treatment. Even so, following purported follow-up examinations of JD on January 17, 2014, February 20, 2014, and April 4, 2014, Lyons and Accelerated Healing routinely directed that JD continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services JD previously had received supposedly had not resolved JD's purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, JD received five months of purported chiropractic "treatment" at Accelerated Healing.

(iii)   On February 28, 2015, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that JC's vehicle was drivable following the accident. The police report further indicated that JC complained of pain to his back and was transported to Somerset Medical Center Emergency Department following the accident. The contemporaneous hospital records indicated that JC complained of knee, wrist, and back pain. The hospital records further indicated that JC was briefly observed on an outpatient basis and discharged that same day with wrist and knee sprain, and lumbar strain diagnoses. To the extent that JC experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not require thirty months of chiropractic treatment and more than twenty-three months of physical therapy treatment. Even so, following purported follow-up examinations of JC on February 15, 2016, March 18, 2016, April 11, 2016, May 11, 2016, June 10, 2016, July 13, 2016, August 12, 2016, September 9, 2016, October 7, 2016, November 4, 2016, November 30, 2016, December 28, 2016, January 27, 2017, March 10, 2017, April 10, 2017, May 17, 2017, June 14, 2017, July 12, 2017, August 17, 2017, September 14, 2017, October 11, 2017, November 16, 2017, December 27, 2017, February 14, 2018, and April 20, 2018, Lyons and Accelerated Healing routinely directed that JC continue to receive chiropractic treatment and/or physical therapy treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services and/or physical therapy services JC previously had received supposedly had not resolved JC's

purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Lyons and Accelerated Healing, JC received more than <u>two years</u> of purported chiropractic "treatment" and more than twenty-three months of purported physical therapy "treatment" at Accelerated Healing.

(iv)     On May 16, 2016, an Insured named MN was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MN's vehicle was drivable following the accident. The police report further indicated that MN was not injured and did not complain of any pain at the scene. In keeping with the fact that MN was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that MN experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not require six and a half months of chiropractic treatment. Even so, following purported follow-up examinations of MN by Lyons on June 29, 2016, July 27, 2016, September 12, 2016, and November 7, 2016, Lyons and Accelerated Healing routinely directed that MN continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services MN previously had received supposedly had not resolved MN's purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, MN received six and a half months of purported chiropractic "treatment" at Accelerated Healing.

(v)     On May 16, 2016, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that SA's vehicle was drivable following the accident. The police report further indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that SA experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not require three and a half months of chiropractic treatment. Even so, following purported follow-up examinations of SA by Lyons on June 29, 2016, and July 27, 2016, Lyons and Accelerated Healing routinely directed that SA continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services SA previously had received supposedly had not resolved SA's purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, SA received three and a half months of purported chiropractic "treatment" at Accelerated Healing.

(vi)     On August 8, 2016, an Insured named KH was involved in an automobile accident. The contemporaneous police report indicated that KH's vehicle was drivable following the accident. The police report further indicated that KH was not injured and did not complain of any pain at the scene. In keeping with the fact that KH was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that KH experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not

102

require twenty months of chiropractic treatment and more than six months of physical therapy treatment Even so, following purported follow-up examinations of KH on November 16, 2016, December 15, 2016, January 11, 2017, February 16, 2017, March 22, 2017, April 20, 2017, May 18, 2017, June 21, 2017, July 17, 2017, September 11, 2017, October 9, 2017, November 16, 2017, December 14, 2017, January 18, 2018, February 22, 2018, April 2, 2018, and May 3, 2018, Lyons and Accelerated Healing routinely directed that KH continue to receive chiropractic treatment and/or physical therapy treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services and/or physical therapy services KH previously had received supposedly had not resolved KH's purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Lyons and Accelerated Healing, KH received more than a year and a half of purported chiropractic "treatment" and more than six months of purported physical therapy "treatment" at Accelerated Healing.

(vii)  On December 20, 2016, an Insured named MV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MV's vehicle was drivable following the accident. The police report further indicated that, although MV complained of pain to her back, she refused medical attention at the scene. Following the accident Emergency Medical Services responded to the scene. The contemporaneous emergency medical services records indicated that MV complained of back pain and refused medical attention at the scene. Nonetheless, the following day, on December 21, 2016, MV traveled on her own to Saint Peter's University Hospital Emergency Department. The contemporaneous hospital records indicated that, although MV complained of intermittent pain to her leg, MV denied any pain to her back. The hospital records further indicated that MV was briefly observed on an outpatient basis and discharged that same day without a formal diagnosis, only the notation that she had been involved in a motor vehicle accident. To the extent that MV experienced any health issues at all as the result of the accident, the injuries were soft tissue injuries that did not require fourteen months of chiropractic treatment. Even so, following purported follow-up examinations of MV on February 13, 2017, March 16, 2017, April 12, 2017, May 15, 2017, June 13, 2017, July 10, 2017, August 16, 2017, September 12, 2017, October 19, 2017, November 14, 2017, and January 9, 2018, Lyons and Accelerated Healing routinely directed that MV continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services MV previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, MV received more than one year of purported chiropractic "treatment" at Accelerated Healing.

(viii)  On December 20, 2016, an Insured named GV was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that GV's vehicle was drivable following the accident. The police report further indicated that GV was not injured and did not complain of

any pain at the scene. Nonetheless, the following day, on December 21, 2016, GV traveled on her own to Saint Peter's University Hospital Emergency Department. The contemporaneous hospital records indicated that GV complained of intermittent pain to her ankle and denied any pain to her back. The hospital records further indicated that GV was briefly observed on an outpatient basis and discharged that same day without a formal diagnosis, only with the notation that she had been involved in a motor vehicle accident. To the extent that GV experienced any health issues at all as the result of the accident, the injuries were soft tissue injuries that did not require two and a half months of chiropractic treatment. Even so, following purported follow-up examinations of GV on February 13, 2017, and March 16, 2017, Lyons and Accelerated Healing routinely directed that GV continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services GV previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, GV received two and a half months of purported chiropractic "treatment" at Accelerated Healing.

(ix)   On January 12, 2017, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MR's vehicle was drivable following the accident. The police report further indicated that MR was not injured and did not complain of any pain at the scene. In keeping with the fact that MR was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MR experienced any health issues at all as a result of the accident, the injuries were soft tissue injuries that did not require six months of chiropractic treatment. Even so, following purported follow-up examinations of MR on February 28, 2017, April 7, 2017, May 31, 2017, and June 27, 2017, Lyons and Accelerated Healing routinely directed that MR continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services MR previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, MR received six months of purported chiropractic "treatment" at Accelerated Healing.

(x)    On March 13, 2017, an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that AS's vehicle was drivable following the accident. The police report further indicated that AS was not injured and did not complain of any pain at the scene. In keeping with the fact that AS was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that AS experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not require sixteen months of chiropractic treatment. Even so, following purported follow-up examinations of AS by Lyons on May 11, 2017, June 12, 2017, July 11, 2017, August 8, 2017, September 14, 2017, October 19, 2017, November 20, 2017, December 18, 2017,

January 18, 2018, February 22, 2018, March 26, 2018, May 10, 2018, June 7, 2018, and July 20, 2018, Lyons and Accelerated Healing routinely directed that AS continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services AS previously had received supposedly had not resolved AS's purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, AS received more than <u>one year</u> of purported chiropractic "treatment" at Accelerated Healing.

(xi)    On March 13, 2017, an Insured named AO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that AO's vehicle was drivable following the accident. The police report further indicated that AO was not injured and did not complain of any pain at the scene. In keeping with the fact that AO was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that AO experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not require sixteen and a half months of chiropractic treatment. Even so, following purported follow-up examinations of AO by Lyons on May 15, 2017, June 12, 2017, July 11, 2017, August 9, 2017, and September 6, 2017, October 2, 2017, November 2, 2017, November 28, 2017, December 27, 2017, January 25, 2018, February 22, 2018, April 6, 2018, and May 11, 2018, Lyons and Accelerated Healing routinely directed that AO continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services AO previously had received supposedly had not resolved AO's purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, AO received nearly a year and a half of purported chiropractic "treatment" at Accelerated Healing.

(xii)   On July 14, 2017, an Insured named BJ was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that BJ's vehicle was drivable following the accident. The police report further indicated that BJ was not injured and did not complain of any pain at the scene. Nonetheless, later that day BJ traveled on her own to Family Care, and Family Care conducted an independent physical examination of BJ. The contemporaneous Family Care records indicated that BJ complained of back, neck, and knee pain. The Family Care records further indicated that BJ was diagnosed with cervical and lumbar strain, and a mild knee contusion. To the extent that BJ experienced any health issues at all as a result of the accident, the injuries were soft tissue injuries that did not require twelve months of chiropractic treatment. Even so, following purported follow-up examinations of BJ on August 28, 2017, September 27, 2017, October 25, 2017, November 20, 2017, December 18, 2017, January 16, 2018, February 13, 2018, March 20, 2018, April 17, 2018, May 15, 2018, June 12, 2018, and July 11, 2018, Lyons and Accelerated Healing routinely directed that BJ continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services BJ previously had received supposedly had not resolved BJ's purported

105

symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, BJ received <u>one year</u> of purported chiropractic "treatment" at Accelerated Healing.

(xiii)   On August 1, 2017, an Insured named RM was involved in an automobile accident. The contemporaneous police report indicated that RM's vehicle was drivable following the accident. The police report further indicated that Roland Moya complained of pain to his neck and was transported to Saint Peters University Hospital Emergency Department following the accident. The contemporaneous hospital records indicated that RM was briefly observed on an outpatient basis and discharged that same day with a muscle strain diagnosis. To the extent that RM experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not require twelve months of chiropractic treatment and five and a half months of physical therapy treatment. Even so, following purported follow-up examinations of RM on August 29, 2017, September 26, 2017, October 24, 2017, November 21, 2017, December 19, 2017, January 18, 2018, February 16, 2018, March 29, 2018, April 27, 2018, May 24, 2018, and June 27, 2018, Lyons and Accelerated Healing routinely directed that RM continue to receive chiropractic treatment and/or physical therapy treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services and/or physical therapy services RM previously had received supposedly had not resolved RM's purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Lyons and Accelerated Healing, RM received <u>one year</u> of purported chiropractic "treatment" and five and a half months of purported physical therapy "treatment" at Accelerated Healing.

(xiv)   On September 1, 2017, an Insured named MB was involved in an automobile accident. The contemporaneous police report indicated that MB's vehicle was drivable following the accident. The police report further indicated that MB was not injured and did not complain of any pain at the scene. In keeping with the fact that MB was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that MB experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not require ten months of chiropractic treatment and six months of physical therapy treatment. Even so, following purported follow-up examinations of MB on October 24, 2017, November 20, 2017, December 19, 2017, January 23, 2018, February 21, 2018, March 21, 2018, April 18, 2018, May 16, 2018, and June 18, 2018, Lyons and Accelerated Healing routinely directed that MB continue to receive chiropractic treatment and/or physical therapy treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services and/or physical therapy services MB previously had received supposedly had not resolved MB's purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Lyons and Accelerated Healing, MB received ten months of purported chiropractic "treatment" and six months of purported physical therapy "treatment" at Accelerated Healing.

(xv)     On September 26, 2017, an Insured named ER was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that ER's vehicle was drivable following the accident. The police report further indicated that ER complained of pain to her back and was transported to New York Presbyterian Hospital Emergency Department following the accident. The contemporaneous hospital records indicated that ER complained of achy pain to her lower back. The hospital records further indicated that ER was briefly observed on an outpatient basis and discharged that same day with a lower back pain diagnosis. To the extent that ER experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not require ten months of chiropractic treatment. Even so, following purported follow-up examinations of ER on November 2, 2017, December 11, 2017, January 9, 2018, February 8, 2018, March 7, 2018, April 4, 2018, May 1, 2018, and June 12, 2018, Lyons and Accelerated Healing routinely directed that ER continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services ER previously had received supposedly had not resolved ER's purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, ER received ten months of purported chiropractic "treatment" at Accelerated Healing.

(xvi)    On October 26, 2017, an Insured named AR was involved in an automobile accident. The contemporaneous police report indicated that AR's vehicle was drivable following the accident. The police report further indicated that AR was not injured and did not complain of any pain at the scene. In keeping with the fact that AR was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that AR experienced any health problems at all as a result of the accident, the injuries were soft tissue injuries that did not require eight months of chiropractic treatment. Even so, following purported follow-up examinations of AR on December 14, 2017, January 11, 2018, February 14, 2018, March 12, 2018, April 12, 2018, May 11, 2018, June 19, 2018, and July 17, 2018, Lyons and Accelerated Healing routinely directed that AR continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services AR previously had received supposedly had not resolved AR's purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, AR received eight months of purported chiropractic "treatment" at Accelerated Healing.

(xvii)   On February 23, 2018, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a rear-end collision and that MG's vehicle was drivable following the accident. The police report further indicated that MG was not injured and did not complain of any pain at the scene. In keeping with the fact that MG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident,

107

the injuries were soft tissue injuries that did not require four months of chiropractic treatment. Even so, following purported follow-up examinations of MG on May 2, 2018, and June 1, 2018, Lyons and Accelerated Healing routinely directed that MG continue to receive chiropractic treatment at Accelerated Healing, despite the fact that the large amount of chiropractic services MG previously had received supposedly had not resolved MG's purported symptoms. As a result of the medically unnecessary chiropractic directives by Lyons and Accelerated Healing, MG received four months of purported chiropractic "treatment" at Accelerated Healing.

215.    These are only representative examples. In the claims for chiropractic and physical therapy services that are identified in Exhibit "1", Accelerated Healing, Lyons, and Davis routinely used the phony "diagnoses" provided to the Insureds at the conclusion of the putative initial and follow-up examinations as a false basis to bill for months and months of medically unnecessary chiropractic treatment and/or physical therapy treatment in gross deviation from the Care Paths.

216.    As set forth above, the Care Paths – which generally require healthcare providers to provide some objective justification for the medical necessity of continued healthcare services at the four–week, eight–week, and 13–week mark – are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

217.    The Defendants' fraudulent scheme enabled them to bill for months of medically unnecessary chiropractic services per Insured and/or months of medically unnecessary physical therapy services per Insured, without regard for the Insureds' true circumstances or presentation.

**b.    The Fraudulent Billing for the Application of Hot/Cold Packs**

218.    Not only did Accelerated Healing, Lyons, and Davis routinely bill GEICO for medically unnecessary chiropractic treatment and/or physical therapy treatment, but Accelerated Healing, Lyons, and Davis also routinely and fraudulently unbundled separate charges for the

application of hot/cold packs from the underlying physical therapy treatment, in a calculated effort to increase the billing for the treatment.

219.   As noted above, New Jersey law prohibits healthcare providers from "unbundling" procedures – i.e., artificially separating what is inherently one procedure for the purpose of increased billing is prohibited. <u>See</u> N.J.A.C. 11:3-29.4.

220.   More specifically, N.J.A.C. 11:3–29.4(g)(2) provides that the application of hot/cold packs under CPT code 97010 is bundled into the payment for other services and shall not be reimbursed separately.

221.   Even so, in order to increase the amount of fraudulent billing they could submit to GEICO and other insurers, Accelerated Healing, Lyons, and Davis routinely unbundled billing for the application of hot/cold packs from the underlying physical therapy charges so as to maximize the amount of fraudulent billing they could submit to GEICO.

222.   For example:

(i)   Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named JG on October 30, 2013, October 31, 2013, November 6, 2013, November 7, 2013, November 13, 2013, November 14, 2013, November 20, 2013, November 21, 2013, November 26, 2013, November 27, 2013, December 2, 2013, December 3, 2013, December 10, 2013, December 11, 2013, December 16, 2013, December 19, 2013, December 20, 2013, December 23, 2013, December 26, 2013, December 27, 2013, December 31, 2013, and January 2, 2014.

(ii)   Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named JR on April 28, 2014, April 30, 2014, June 2, 2014, August 7, 2014, August 13, 2014, July 9, 2015, July 15, 2015, July 20, 2015, July 22, 2015, July 23, 2015, July 29, 2015, August 11, 2015, August 14, 2015, August 17, 2015, August 19, 2015, and August 25, 2015.

(iii)    Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named JS on October 15, 2014, October 20, 2014, October 30, 2014, November 5, 2014, November 6, 2014, November 25, 2014, November 26, 2014, and December 4, 2014.

(iv)    Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named CO on November 20, 2014, November 24, 2014, November 25, 2014, November 26, 2014, December 1, 2014, December 2, 2014, December 4, 2014, December 8, 2014, December 9, 2014, December 11, 2014, December 15, 2014, December 16, 2014, December 17, 2014, December 22, 2014, December 23, 2014, January 6, 2015, January 7, 2015, January 9, 2015, January 13, 2015, January 14, 2015, January 21, 2015, January 22, 2015, January 23, 2015, January 28, 2015, January 29, 2015, January 30, 2015, February 3, 2015, February 4, 2015, February 5, 2015, February 10, 2015, February 12, 2015, February 17, 2015, February 18, 2015, February 20, 2015, February 24, 2015, February 25, 2015, February 26, 2015, March 3, 2015, March 4, 2015, March 10, 2015, March 11, 2015, March 12, 2015, April 8, 2015, April 9, 2015, April 14, 2015, April 20, 2015, April 22, 2015, April 24, 2015, April 27, 2015, April 30, 2015, May 1, 2015, May 4, 2015, May 6, 2015, May 8, 2015, May 12, 2015, May 13, 2015, May 18, 2015, and May 19, 2015.

(v)    Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named YC on October 8, 2015, October 9, 2015, October 12, 2015, October 14, 2015, October 15, 2015, and October 20, 2015.

(vi)    Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named OG on October 26, 2015, October 27, 2015, October 28, 2015, November 2, 2015, November 3, 2015, November 4, 2015, November 10, 2015, November 11, 2015, November 17, 2015, November 19, 2015, November 23, 2015, November 24, 2015, November 30, 2015, December 3, 2015, December 7, 2015, December 14, 2015, December 15, 2015, December 21, 2015, December 23, 2015, December 28, 2015, December 29, 2015, January 4, 2016, January 7, 2016, January 11, 2016, January 12, 2016, January 18, 2016, January 20, 2016, January 25, 2016, January 26, 2016, February 1, 2016, February 2, 2016, February 8, 2016, February 15, 2016, February 18, 2016, February 22, 2016, and February 24, 2016.

(vii)     Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named SO on November 19, 2015, November 23, 2015, November 24, 2015, November 25, 2015, December 1, 2015, December 2, 2015, December 3, 2015, December 8, 2015, December 9, 2015, December 10, 2015, December 15, 2015, December 16, 2015, December 17, 2015, December 21, 2015, December 22, 2015, December 23, 2015, December 28, 2015, December 29, 2015, December 30, 2015, January 5, 2016, January 7, 2016, January 12, 2016, January 13, 2016, January 14, 2016, January 19, 2016, January 20, 2016, January 21, 2016, January 26, 2016, January 27, 2016, January 28, 2016, February 2, 2016, February 3, 2016, February 4, 2016, February 9, 2016, February 10, 2016, February 11, 2016, February 16, 2016, February 17, 2016, February 18, 2016, February 23, 2016, February 25, 2016, April 12, 2016, April 14, 2016, April 21, 2016, April 26, 2016, and April 28, 2016.

(viii)    Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named RG on February 2, 2016, February 4, 2016, February 8, 2016, February 9, 2016, February 11, 2016, February 16, 2016, February 17, 2016, February 19, 2016, February 22, 2016, February 23, 2016, February 26, 2016, February 29, 2016, April 12, 2016, April 18, 2016, April 20, 2016, April 21, 2016, April 25, 2016, April 26, 2016, April 28, 2016, May 2, 2016, May 3, 2016, May 5, 2016, May 18, 2016, May 24, 2016, May 26, 2016, May 31, 2016, June 2, 2016, June 7, 2016, June 9, 2016, June 15, 2016, June 16, 2016, June 21, 2016, and June 23, 2016.

(ix)      Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named VN on October 21, 2016, October 24, 2016, October 26, 2016, October 28, 2016, October 31, 2016, November 1, 2016, November 3, 2016, November 7, 2016, November 8, 2016, November 10, 2016, November 14, 2016, November 16, 2016, November 17, 2016, November 23, 2016, November 28, 2016, November 29, 2016, December 1, 2016, December 5, 2016, December 8, 2016, December 14, 2016, December 15, 2016, December 19, 2016, December 21, 2016, December 22, 2016, December 27, 2016, December 28, 2016, January 4, 2017, January 5, 2017, January 11, 2017, January 16, 2017, January 18, 2017, January 19, 2017, January 25, 2017, January 26, 2017, January 31, 2017, February 1, 2017, February 7, 2017, February 8, 2017, February 10, 2017, February 14, 2017, February 15, 2107, February 16, 2017, February 21, 2017, February 23, 2017, February 27, 2017, February 28, 2017, March 7, 2017, March 9, 2017, March 10, 2017, March 13, 2017, March 16, 2017, March 20, 2017, March 22, 2017, March 23, 2017, March 29, 2017, March 30, 2017, April

26, 2017, May 3, 2017, May 4, 2017, May 11, 2017, May 17, 2017, May 18, 2017, May 24, 2017, May 25, 2017, May 31, 2017, and June 1, 2017.

(x)     Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named AD on April 14, 2016, April 18, 2016, May 4, 2016, and May 9, 2016.

(xi)    Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97014, 97035, and 97110 for physical therapy services that they purported to provide to an Insured named SB on April 19, 2016, April 21, 2016, April 25, 2016, April 27, 2016, and April 28, 2016.

(xii)   Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97110, and G0283 for physical therapy services that they purported to provide to an Insured named MI on March 16, 2017, March 17, 2017, March 22, 2017, March 23, 2017, March 27, 2017, March 29, 2017, March 30, 2017, April 5, 2017, April 7, 2017, April 10, 2017, and April 11, 2017.

(xiii)  Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named RG on March 29, 2017, April 10, 2017, April 12, 2017, April 17, 2017, April 19, 2017, April 24, 2017, April 26, 2017, May 3, 2017, May 4, 2017, May 9, 2017, May 10, 2017, May 15, 2017, May 16, 2017, May 22, 2017, and May 23, 2017.

(xiv)   Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named BA on July 12, 2017, July 17, 2017, July 20, 2017, July 24, 2017, July 25, 2017, July 26, 2017, July 31, 2017, August 2, 2017, and August 7, 2017.

(xv)    Accelerated Healing, Lyons, and Davis unbundled a separate charge of $38.00 for the application of hot/cold packs under CPT code 97010 from charges under CPT codes 97140, 97110, and G0283 for physical therapy services that they purported to provide to an Insured named KR on October 9, 2017, October 11, 2017, October 13, 2017, October 16, 2017, October 18, 2017, October 20, 2017, October 23, 2017, October 30, 2017, November 1, 2017, November 3, 2017, November 6, 2017, November 9, 2017, November 10, 2017, November 15, 2017, November 16, 2017, November 17, 2017, November 20, 2017, November 21, 2017, and November 27, 2017.

223.    Each of the unbundled charges for the application of hot/cold packs misrepresented that Accelerated Healing, Lyons, and Davis were entitled to be reimbursed for the charge, when in fact they were not.

224.    Each of the unbundled charges for the application of hot/cold packs under CPT code 97010 constituted a separate violation of N.J.S.A. § 39:6A–4.6 and N.J.A.C. 11:3–29.4.

**c.    Misrepresentations Regarding the Reimbursable Amount for Chiropractic Services and Physical Therapy Services**

225.    As set forth above, the No-Fault Laws specifically prohibit health care services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A–4.6; N.J.A.C. 11:3–29.6.

226.    As set forth above and in Exhibit "1", Accelerated Healing, Lyons, and Davis routinely misrepresented the reimbursable amount for chiropractic services and physical therapy services.

227.    Pursuant to the Fee Schedule, the maximum reimbursable amount for CPT code 97001 was $114.74.

228.    Pursuant to the Fee Schedule, the maximum reimbursable amount for CPT code 97035 was $27.40.

229.    Pursuant to the Fee Schedule, the maximum reimbursable amount for CPT code 97110 was $50.87.

230.    Pursuant to the Fee Schedule, the maximum reimbursable amount for CPT code 97124 was $38.67.

231.    Pursuant to the Fee Schedule, the maximum reimbursable amount for HCCPCS code G0283 was $20.14.

232.    Pursuant to the Fee Schedule, charges under CPT code 97014 were unreimbursable.

233.    Nonetheless, and as set forth in Exhibit "1", in order to maximize their fraudulent charges for the putative chiropractic services and physical therapy services, Accelerated Healing, Lyons, and Davis routinely falsely represented that they were entitled to recover:

(i)      $140.00 per physical therapy service under CPT code 97001;

(ii)     $25.00 per electrical stimulation service under CPT code 97014;

(iii)    $40.00 per chiropractic service or physical therapy service under CPT code 97035;

(iv)    between $75.00 and $85.00 per chiropractic service or physical therapy service under CPT 97110;

(v)     $45.00 per physical therapy service under CPT code 97124; and

(vi)    $25.00 per chiropractic service or physical therapy service under HCCPCS code G0283.

234.    Each and every time that Accelerated Healing, Lyons, and Davis falsely represented that they were entitled to be reimbursed for their putative chiropractic services and physical therapy services in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A–4.6 and N.J.A.C. 11:3–29.6.

235.    In the claims identified in Exhibit "1", Accelerated Healing, Lyons, and Davis routinely falsely represented that they were entitled to be reimbursed for their putative chiropractic services and physical therapy services in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

III.   **The Fraudulent Charges the Defendants Submitted or Caused to be Submitted to GEICO**

236.   To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA–1500 forms and treatment reports through Accelerated Healing, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

237.   The HCFA–1500 forms and treatment reports were false and misleading, and in violation of the Insurance Fraud Prevention Act, in the following material respects:

(i)   The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (b) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services; and (c) the Defendants falsified their patient records.

(ii)   The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (b) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services; and (c) the Defendants falsified their patient records.

(iii)   The HCFA–1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.     GEICO's Justifiable Reliance

238.     The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submit, or cause to be submitted, to GEICO.

239.     To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

240.     Specifically, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly are subjected to them.

241.     Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

242.     The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time–consuming arbitration and litigation against GEICO and other insurers if the charges were not promptly paid in full.

243.     GEICO is under statutory and contractual obligations to promptly and fairly process claims.  The facially–valid documents submitted to GEICO in support of the fraudulent

charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $900,000.00 based upon the fraudulent charges representing payments made by GEICO to Accelerated Healing.

244.     Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Accelerated Healing
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

245.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 244 above.

246.     There is an actual case in controversy between GEICO and Accelerated Healing as to whether Accelerated Healing was in compliance with all relevant laws and regulations governing healthcare practice during the time period when billing for the Fraudulent Services was submitted to GEICO.

247.     As set forth above, at all relevant times, Accelerated Healing operated in violation of New Jersey law by billing unlawfully inflated amounts for medically unnecessary, and in some cases illusory, healthcare services, and by falsifying its patient records.

248.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that from 2012 through the present, Accelerated Healing was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

**SECOND CAUSE OF ACTION**
**Against All Defendants**
**(Violation of New Jersey Insurance Fraud Prevention Act – (<u>N.J.S.A.</u> 17:33A–1 <u>et seq.</u>))**

249.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 244 above.

250.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Accelerated Healing, Lyons, and Davis knowingly submitted or caused to be submitted HCFA–1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (b) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services; and (c) the Defendants falsified their patient records.

(ii)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (b) the Defendants routinely violated N.J.S.A. § 39:6A–4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services; and (c) the Defendants falsified their patient records.

(iii)   The HCFA–1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to

financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

251.     The Defendants' systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7.

252.     As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $900,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## THIRD CAUSE OF ACTION
### Against Lyons
### (Violation of RICO, 18 U.S.C. § 1962(c))

253.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 244 above.

254.     Accelerated Healing is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

255.     Lyons has knowingly conducted and/or participated, directly or indirectly, in the conduct of Accelerated Healing's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than five years seeking payments that Accelerated Healing was not entitled to receive under the No-Fault Laws because: (i) the billed-for-services were not

medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) in many cases, the billed-for services were not performed at all; (v) Accelerated Healing was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice; and (vi) the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

256.    Accelerated Healing's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lyons has operated Accelerated Healing, inasmuch as Accelerated Healing is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Accelerated Healing to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Alliance to the present day.

257.    Accelerated Healing is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Accelerated Healing in pursuit of inherently

unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

258.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $900,000.00 pursuant to the fraudulent bills submitted through Accelerated Healing.

259.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against Lyons and Davis**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

260.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 244 above.

261.    Accelerated Healing is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

262.    Lyons and Davis knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Accelerated Healing's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Accelerated Healing was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not

performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither Accelerated Healing nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

263.    Accelerated Healing's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lyons has operated Accelerated Healing, inasmuch as Accelerated Healing is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Accelerated Healing to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Accelerated Healing to the present day.

264.    Accelerated Healing is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Accelerated Healing in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

265.    Lyons and Davis knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

266.   GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $900,000.00 pursuant to the fraudulent bills submitted through Accelerated Healing.

267.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against All Defendants**
**(Common Law Fraud)**

268.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 244 above.

269.   The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submitted of thousands of fraudulent charges seeking payment for the Fraudulent Services.

270.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them; and (iv) in every claim identified in Exhibit "1", the

representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice in New Jersey, and were eligible for PIP reimbursement, when in fact they were not.

271.    The Defendants intentionally made the above-describe false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Accelerated Healing that were not compensable under New Jersey's No-Fault Laws.

272.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $900,000.00 pursuant to the fraudulent bills submitted by the Defendants through Accelerated Healing.

273.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

274.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

275.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 244 above.

276.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

277.    When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

278.    The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

279.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

280.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $$900,000.00.

## JURY DEMAND

281.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.      On the First Cause of Action against Accelerated Healing, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, Accelerated Healing was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey;

B.      On the Second Cause of Action against the Defendants, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $900,000.00, as well as: (i) treble damages; (ii) the costs and counsel feels incurred in connection

with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A–7;

     C.     On the Third Cause of Action against Lyons, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $900,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

     D.     On the Fourth Cause of Action against Lyons and Davis, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $900,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

     E.     On the Fifth Cause of Action against the Defendants compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $900,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

     F.     On the Sixth Cause of Action against the Defendants, more than $900,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: January 8, 2019          RIVKIN RADLER LLP

                By:                      

                John Robertelli, Esq.
                Gene Y. Kang, Esq.
                Barry I. Levy, Esq. (to be admitted *pro hac vice*)
                Max Gershenoff, Esq. (to be admitted *pro hac vice*)
                Christina Bezas, Esq. (to be admitted *pro hac vice*)
                21 Main Street, Suite 158
                Court Plaza South, West Wing
                Hackensack, New Jersey 07601
                (201) 287–2460